556 A.2d 280

**Charles PARHAM**

v.

**STATE of Maryland.**

No. 1225, Sept. Term, 1988.

Court of Special Appeals of Maryland.

April 5, 1989.

Arthur A. DeLano, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender on the brief), Baltimore, for appellant.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City on the brief), Baltimore, for appellee.

Submitted Before BISHOP, ROSALYN B. BELL and WENNER, JJ.

ROSALYN B. BELL, Judge.

Charles Parham was convicted by a jury in the Circuit Court for Baltimore City of assault with intent to murder, burglary and carrying a deadly weapon openly with intent to injure. He was sentenced to seven years imprisonment for the assault with intent to murder, three years for carrying a deadly weapon with intent to injure, and seven years for the burglary, all sentences to run concurrently with each other.

On appeal, Parham contends:

—The trial court abused its discretion in refusing to grant a mistrial following an emotional outburst by his mother-in-law.

—The trial court abused its discretion in refusing to grant his request for a postponement to secure the presence of two alibi witnesses.

—The evidence was insufficient to sustain the burglary conviction.

We disagree and affirm.

Parham and Charlene Queen were married in June of 1987. In early fall, they moved to 2540 West Lombard Street, Baltimore. According to Queen, Parham "was always beating on me, hitting on me, so I told him when we moved on Lombard Street if he started the same thing again that I was going to put him out. He started it so I had to put him out." This occurred in October. On December 16, 1987, Queen returned home at 10:00 p.m. She related the events to the jury:

\* \* \* \* \* \*

"When I turned the bedroom light on the pictures on the wall was tampered with and the drawers halfway open and I thought I know I didn't leave my room like this, I thought, oh well, so I put the gifts on the floor because during that time the carpeting was not done upstairs yet and while I was proceeding to close the dresser drawer someone grabbed me from behind with gloves on and threw me on the floor in the hallway to my

bedroom and put a knife to my throat and said bitch, if you scream I am going to cut your throat and he threw me in the bathroom and I shut the door real fast, I was screaming and I wondered why [my] mother had not called yet. I heard the phone ring so I figured she thought I was not home yet, or stopped at somebody house.

"BY [ASSISTANT STATE'S ATTORNEY]:

"Q. Earlier you said that someone grabbed you. Were you able to see who it was?

"A. Yes, when he threw me on the floor and said bitch you better not scream, I knew who it was.

\* \* \* \* \* \*

"Q. ... After you went into the bathroom what happened?

"A. I shut the door, locked it—I put my feet up on the toilet for support so he could not get in. I was screaming and hoping that my mother would call. When she called no one answered the phone. I guess she figured that I stopped at a friend's house.

"While I was screaming, Charles, my husband went downstairs and got the biggest butcher knife that I own in my kitchen.

\* \* \* \* \* \*

"A. Then he took the knife and cut the door, carved through the door, kicked his foot through it, and I was screaming help me please, and I say Charles it is not worth it, and he say bitch I have been planning this for six weeks, take your clothes off and run a hot tub of water. So I asked him why, he said I am going ... to cut you in pieces and put you in water. Then he took this knife and jammed it in my head right here, and that is when I knew he was going to cut me up in pieces and put me in the tub of water.

\* \* \* \* \* \*

"A. So that is when I knew he was going to do it so I said please Charles it is not worth it, and so he said bitch I ain't trying to hear that. So he said you got 30 seconds to take all your clothes off, so as soon as he walked a little bit from the bath room it is a room next to the bathroom so that is when I ran and jumped out the window and cut my face and ... my forehead.

\* \* \* \* \* \*

"A. He said you have 30 seconds and he was like proceeding out the bathroom across to the—and I said I would rather jump out the window and kill myself than to let him stab me and cut me up and put me in a tub of water.

\* \* \* \* \* \*

"A. What happened was I never made it to the ground or second level of the condominium. He had me by my hair and—he had me by my hair trying to bring me back into the house. He took the knife and stabbed me in the back.

"Q. Before or after you went through the window?

"A. I never made the jump to the ground. I guess he was behind me. He grabbed me by my hair and I was trying to fight him to get off of me, he was trying to bring me back in the house. Then he stabbed me in the back and let me go."

\* \* \* \* \* \*

"A. When he let me go, I just had my eyes closed and I thought that was it. I thought that was it. I landed on my back, I was unconscious for like half a second, and where I live is like a parking lot then an alley and like houses there and I saw people out there and I jumped up running, screaming help me, help me, he stabbed me. And the guys—I don't know their names I was new around the area, and my leg collapsed, I had to get stitches in my leg. They took me in the house and I was bleeding and one guy got his mother. She was a nurse

and she tried to stop the bleeding until the para-medics and police came."

Queen identified Parham as the man who did all this to her.

## THE MOTION FOR A MISTRIAL

During the trial, the victim's mother shouted something at appellant while he was testifying in his own defense. Despite the court's conclusion as to audibility of the comment, the reporter did record the incident. Appellant was being asked how many times he had been in for drug and alcohol treatment. He answered, "I don't know how many times, but it has been several times." At that point, the victim's mother yelled, "Every time you beat my daughter's behind, that is how many times you went there." Appellant moved for a mistrial. The trial judge denied the motion and stated:

"There was a lady, as it turns out she was the mother of the estranged wife of this defendant, but that was not— the court nor the jury did not know that because the witnesses have been sequestered in this case and the lady was sitting by herself at the end of the bench.

"She did at one point get up and briefly and emotionally yell something at this defendant, certainly not in a friendly but in a hostile manner. Granted that, what she said was not clear to me, but it was clear to the court reporter who was seated quite close [to] her. I could not hear it and [Assistant State's Attorney] could not hear it, and taking into account the acoustics in this courtroom[,] I think there may have been one or two words the jury could have heard."

The trial judge then instructed the jury as follows:

"Members of the jury, we are going to continue. I remind you that your decision in this case must be based solely on the evidence that comes in during the trial. You did hear briefly a woman get up and make an emotional comment. I am not sure whether you understood it or not. In any event, you are to disregard that comment and that particular lady who is not a witness in this case.

Disregard her action totally in your deliberation when you deliberate as to the guilt or innocence of this defendant."

On appeal, appellant contends that the court's instructions were ineffective to cure the prejudice to him as a result of the incident and the denial of his motion for mistrial was an abuse of discretion. We do not agree.

A motion for mistrial, based on the behavior in the courtroom of a member of the victim's family, should only be granted under very extraordinary circumstances, and this determination lies largely within the discretion of the trial judge. *Hunt v. State*, 312 Md. 494, 502–03, 540 A.2d 1125 (1988). This determination will not be disturbed absent a clear showing of prejudice to the defendant. *Hunt*, 312 Md. at 503, 540 A.2d 1125. Moreover, "[e]motional responses in a courtroom are not unusual, especially in criminal trials, and manifestly, the defendant is not entitled to a mistrial every time someone becomes upset in the court of trial." *Hunt*, 312 Md. at 501, 540 A.2d 1125.

In the instant case, neither the trial judge nor counsel was in the position to anticipate the outburst in this case. The witnesses had been sequestered and no one was aware that the victim's mother would react as she did during appellant's testimony. The trial judge acknowledged the outburst, assessed its impact upon the jury, and gave curative instructions. Appellant did not request any alternative relief to a mistrial, such as inquiry of the jury to learn if any of them did know what was said. The trial judge was in the best position to evaluate any prejudicial effect, and we defer to her assessment. Thus, we find no clear showing of prejudice and no abuse of discretion in the denial of the mistrial.

## THE MOTION FOR A CONTINUANCE

Appellant contends that the trial court erred in denying his request for a continuance to secure the testimony of three alibi witnesses.

■ After the jury was impaneled, appellant requested a continuance in order to call some witnesses who, according to his counsel, "may or may not be alibi witnesses." These alibi witnesses had not been disclosed to defense counsel until the day of trial nor had they been given to the State. Appellant's failure to disclose these alibi witnesses was in violation of the State's request for discovery in accordance with Rule 4–263(d)(3). Under Rule 4–263(i), the trial court has broad discretion as to how violations of discovery will be handled. The trial judge could have refused to permit the witnesses to testify even if they appeared. She was not so restrictive, however. She advised counsel that, if he could locate the witnesses and secure their attendance while the trial was still in progress, she would permit them to testify, but she declined to grant a continuance. The treatment afforded appellant was actually on the generous side, especially since the request was not made until the morning of the second day of trial.[1] We perceive no abuse of discretion on the part of the trial judge. *See Faulkner v. State,* 73 Md.App. 511, 526, 534 A.2d 1380 (1988).

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ Prior to trial, appellant attempted to discharge counsel, insisting that counsel was not representing his interests. The court denied his request and appellant now claims he was ineffectively represented during the trial.

As we have often noted, a claim of ineffective assistance of counsel is more properly before the circuit court in a petition for post conviction relief brought pursuant to Md. Code Ann. Art. 27, § 645A (1957, 1987 Repl. Vol., 1988 Supp.). *See, e.g., Robeson v. State,* 39 Md.App. 365, 383, 386 A.2d 795 (1978), *aff'd,* 285 Md. 498, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980). We see nothing in the instant case to warrant an exception to that practice.

---

**1.** The first day was taken up with plea negotiations and jury selection.

## SUFFICIENCY OF THE EVIDENCE ON
## BURGLARY COUNT

■ As his last assignment of error, appellant contends that there was insufficient evidence presented at trial to support his conviction for burglary.

In determining the sufficiency of the evidence, the appropriate inquiry is not whether the reviewing court itself believes that the evidence at trial established guilt beyond a reasonable doubt;

> "[i]nstead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). In accordance with this standard, it is the responsibility of the trier of fact, and not the reviewing court, "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

■ Burglary is the breaking and entering of a dwelling house of another in the nighttime with an intent to commit a felony. *Martin v. State*, 10 Md.App. 274, 275, 269 A.2d 182 (1970). Here, appellant relies on the failure of the State to establish one element—that is, that the breaking was into "a dwelling house *of another.*" As a basis for this contention, appellant maintains that, as long as he and Queen remain married, the dwelling place is still marital property and thus, he has an absolute right to be there. Appellant avers that, even though they separated on numerous occasions, the October separation was not final since some of his clothes were still in the condominium. Accordingly, he could not be convicted for burglary since his breaking and entering was not the dwelling place of another, but rather his own. We disagree.

■ The law of burglary was designed for the purpose of protecting the habitation, *Arnold v. State,* 7 Md.App. 1, 3, 252 A.2d 878 (1969), and thus, occupancy or possession, rather than ownership, is the test.[2] 3 C. Torcia, *Wharton's Criminal Law* § 335 (14th ed.1980). *See also State v. Schneider,* 36 Wash.App. 237, 673 P.2d 200, 203 (1983).

The only evidence on the status of the property in the instant case was that Queen was in sole possession and in the process of purchasing the property in her own name, and that appellant was living with his sister and was not on the title. Appellant had separated from his wife approximately six weeks prior to the incident, having spent only a week in the West Lombard Street home before the separation. He had left very few belongings there; most of his clothes were at other places.[3]

■ While we have not had occasion to hold specifically that an estranged spouse can be convicted of burglary if the dwelling house broken into was once shared with his or her spouse, other courts have held, virtually unanimously, that the marital relationship does not preclude a conviction for burglary. We discovered no cases other than the following. *See Cladd v. State,* 398 So.2d 442, 443 (Fla.1981) (husband who had been separated from wife for six months with no formal separation agreement or restraining order had no ownership or possessory interest in wife's apartment and

---

**2.** Appellant contends that since the property was acquired during the marriage it is marital property unless it falls within a specified exception. Md.Fam. Law Code Ann. § 8–201(e) (1984). The court may not, however, transfer the ownership of that property from one to the other. Md.Fam. Law Code Ann. § 8–202(a)(3) (1984, 1988 Cum.Supp.). While appellant might seek a monetary award based on that acquisition, Md.Fam. Law Code Ann. § 8–205 (1984 Repl. Vol, 1988 Cum.Supp.), that scarcely gives him an ownership interest in the condominium.

**3.** Also indicative of appellant's lack of a possessory or occupancy interest is the method he used to gain entry. Appellant threw a brick through a window, unlocked it and entered with the intent to assault his wife. This method of entry is inconsistent with any kind of permissive entry. Moreover, his wife had "put him out" of the home.

could be charged with burglary, expressly overruling *Vazquez v. State,* 350 So.2d 1094 (Fla.App.1977), which held that the husband had a legal right to be with his wife on the premises occupied by her at the time of entry); *Matthews v. Commonwealth,* 709 S.W.2d 414, 420 (Ky.1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986) (husband who was under a court order in connection with a sexual abuse charge to stay away from the premises was not entitled to directed verdict on burglary charge where the evidence indicated he broke into his estranged wife's residence approximately five weeks after they had separated); *Knox v. Commonwealth,* 225 Va. 504, 304 S.E.2d 4, 6 (1983) (husband separated from wife for approximately six months had no proprietary interest in wife's apartment and could be charged with burglary); *State v. Dively,* 431 N.E.2d 540, 543 (Ind.App.1982) (mere fact of conjugal status does not preclude a spouse from committing burglary against the other spouse); *State v. Woods,* 526 So.2d 443, 445 (La.App.1988) (Louisiana's community assets rule did not preclude a burglary conviction of husband of apartment tenanted by legally separated wife); *State v. Cox,* 73 N.C. App. 432, 326 S.E.2d 100, 102–03, *cert. denied,* 313 N.C. 605, 330 S.E.2d 612 (1985) (evidence which established that husband had been separated from his wife without separation agreement for more than a year prior to offense and wife repeatedly refused permission for husband to enter her residence was sufficient to sustain conviction for burglary); *State v. Schneider,* 36 Wash.App. 237, 673 P.2d 200, 203–04 (1983) (sufficient evidence to convict wife who had been separated from husband for nine months of conspiring to burglarize husband's residence where the wife was not living at residence at the time of offense). *But see State v. Weitzel,* 112 Ohio App. 300, 168 N.E.2d 550, 551 (1960) (stating that a man cannot burglarize his wife's home, but *State v. Herrin,* 6 Ohio App.3d 68, 453 N.E.2d 1104, 1106 (1982) seemingly contradicts *Weitzel* in holding that husband who was separated from wife for 12 years committed burglary even though he and his wife owned the house).

The common thread running through these cases is that the mere existence of the marriage relationship does not put a spouse's separate property beyond the protection of the law and subject to the depredation of the other spouse. *See Dively*, 431 N.E.2d at 543.

Given the evidence, a rational trier of fact could have found beyond a reasonable doubt that appellant neither had a possessory interest in the residence nor had a right to be in the residence at the time he entered.[4] We hold the evidence is sufficient to sustain appellant's conviction for burglary.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

---

4. This holding is consistent with Md.Code Ann. Art. 27, § 343 (1957, 1987 Repl. Vol.), which provides in pertinent part:
    "(c) It is a defense to the offense of theft that ... (3) [t]he property involved was that of the defendant's spouse, unless the defendant and the defendant's spouse were not living together as man and wife and were living in separate abodes at the time of the alleged theft...."