COMMONWEALTH *vs.* DAVID M. ROBBINS.

Middlesex. January 12, 1996. - March 19, 1996.

Present: LIACOS, C.J., WILKINS, LYNCH, & FRIED, JJ.

*Practice, Criminal,* Assistance of counsel, Instructions to jury, Capital case. *Homicide. Intoxication. Mental Impairment. Felony-Murder Rule. Intent. Burglary.*

A defendant convicted of murder in the first degree did not demonstrate that his trial counsel was ineffective in the presentation of evidence of lack of criminal responsibility. [307-309]

Where at a murder trial, the jury returned a verdict of guilty of murder in the first degree by reason of deliberate premeditation and the evidence was sufficient to support that verdict, error in the judge's instructions with respect to extreme atrocity or cruelty was harmless and without any prejudicial undermining effect on the otherwise proper verdict on the remaining ground. [309-311]

At a murder trial the judge's instructions, as requested by the defendant, that allowed the jury to consider the effect of the defendant's voluntary intoxication and mental impairment on every aspect of the charges to which his state of mind was relevant, were sufficient and neither contained error nor in any respect created a substantial likelihood of a miscarriage of justice. [311-312]

A conviction of armed burglary could not stand where the judge did not instruct the jury with respect to the criteria for determining whether the defendant had any right of habitation or occupancy in his wife's apartment at the time he entered the premises. [313-315]

This court set forth the factors applicable to a charge of burglary on which the judge should instruct the jury with respect to a defendant's right to enter the premises in question. [315-316]

Evidence at a first degree murder trial amply supported the verdict of deliberate premeditation. [316-317]

INDICTMENTS found and returned in the Superior Court Department on May 8, 1990.

The cases were tried before *Wendie I. Gershengorn,* J.

A motion for a new trial filed in the Supreme Judicial Court was referred to *O'Connor,* J., and was considered by him.

*James F. McNiff, II,* for the defendant.

*Catherine E. Sullivan,* Assistant District Attorney, for the Commonwealth.

FRIED, J. The defendant, David M. Robbins, was convicted of murder in the first degree and armed burglary in the nighttime. While his appeal was pending, he filed a motion and an amended motion for a new trial in this court. These motions were denied by a single justice of this court to whom they were referred. We consider the matter of those motions together with this appeal and affirm the denial of those motions as well as the defendant's conviction of first degree murder by reason of deliberate premeditation. We reverse the defendant's conviction of armed burglary.

# I

Robbins entered his estranged wife's apartment at about 4 A.M. on April 18, 1990, by slashing the screen door at the back of the apartment and using a key he had borrowed earlier from his wife's daughter (by a previous marriage) to open the inner door. He found his wife in the shower, and stabbed her sixteen times, inflicting a number of mortal wounds, and slit her throat. The victim screamed and struggled, staggered out of the bathroom and collapsed on the kitchen floor. The screams brought her daughter from her room. She shouted at the defendant, "What did you do to my mother." The defendant pushed her out of the way and walked out of the apartment. When the daughter went back to her mother, she was not yet dead. Neighbors were alerted, the police were called, and shortly thereafter Robbins was located in the beam of a police spotlight still holding the bloody knife and covered in blood. Robbins had almost certainly taken the knife from the kitchen of a friend with whom he had been staying that night before he made his way back to his wife's apartment. Once apprehended, Robbins insisted that his wife was still alive and would shortly come to bail him out.

At his eight-day trial, Robbins emphasized issues relating to criminal responsibility, since there could be little dispute that he had actually killed his wife. The evidence showed that Robbins had a long history of serious drug and alcohol abuse, for which he had received in-patient treatment in 1990, 1988, and twice in 1984. In 1990, just days before the killing he had made a suicide threat sufficiently credible that the police had taken him to an in-patient psychiatric facility. His alcoholism had been a principal source of difficulty in his brief marriage

to the victim, which had been characterized by arguments and verbal abuse by Robbins. On one occasion the victim had obtained a temporary restraining order requiring Robbins to remain away from her and the apartment in which she lived. She had allowed him to return thereafter. It was his heavy drinking that had precipitated her decision on the day before the killing to break with Robbins definitively. On that day he had been drinking heavily, beginning in the morning and continuing throughout the night, before he went to sleep for a time at the home of a friend.

At the end of the Commonwealth's evidence the trial judge allowed the defendant's motion for a required finding of not guilty on the indictment charging a violation of a restraining order. The jury returned verdicts finding Robbins guilty of murder in the first degree by deliberate premeditation, extreme atrocity or cruelty, and felony-murder premised on armed burglary, and guilty also of armed burglary. The judge had given a specific unanimity instruction. Defense counsel made detailed requests for instructions on all major issues. The judge's instructions differed in some respect from the requested instructions, and trial counsel objected to several of these deviations. His motions at the close of the Commonwealth's evidence, at the close of all the evidence, and after the return of the verdicts sought required findings of not guilty on the armed burglary and the felony-murder charges, claiming that the evidence was insufficient as matter of law to sustain those charges. Robbins also seeks reversal on the ground that he received ineffective assistance of counsel in presenting his defense relating to his mental state and lack of criminal responsibility and invokes our authority under G. L. c. 278, § 33E (1994 ed.), to order a new trial.

## II

### A

We consider the issue of Robbins's criminal responsibility the most substantial issue in this case. There is no doubt that he was a man in the grips of alcohol. There was testimony about the vast quantities of alcohol he drank, his use of cocaine, and his inability to stay clear of these for any prolonged period of time, even as it became clear that his drinking and the anger and abusive conduct that went along

with it were destroying his life. His wife, the victim, whom he had married only ten months earlier, had turned him out of their home on several occasions, relenting each time either in the face of his promise to reform, or because his condition was so pitiable that he had nowhere else to go. There is support in the record for Robbins's contention that he suffered from delirium tremens, blackouts, and hallucinations because of his heavy drinking. He had been admitted for in-patient medical care for his substance abuse on several occasions. On the day before the killing, he testified that he had drunk as much as a quart of vodka. All this was put before the jury. Defense counsel sought and received an allowance of up to $1,500 from the court to procure expert evaluations and testimony. An evaluation was performed by Dr. Bernard S. Yudowitz, but the results were not introduced in evidence, perhaps because Dr. Yudowitz wrote in his report that he had no evidence that Robbins was intoxicated at the time of the killing or "that his conduct was seriously compromised by his drinking." He concluded that Robbins "does not meet the standards which would show that he was suffering from a mental disease or defect which would have rendered him unable to conform his conduct to the requirements of the law or which would have rendered him unable to appreciate the criminality of his behavior." Dr. Yudowitz did not specifically advert to Robbins's statements after the killing asserting that his wife was still alive and that she would be along soon to bail him out. It is this failure to emphasize what might be described as his hallucinatory thinking as well as evidence of earlier episodes of hallucinations that Robbins's attorney on appeal insists shows that Robbins received ineffective assistance of counsel at trial.

We do not think that trial counsel's conduct allows Robbins to meet that rather stringent test as a ground of relief. See *Commonwealth* v. *Parker,* 420 Mass. 242, 245-246 (1995) (more favorable standard of review for "capital" cases); *Commonwealth* v. *Wright,* 411 Mass. 678, 681-682 (1992); *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). Trial counsel emphasized Robbins's experience of blackouts as the main support for a conclusion that Robbins was not responsible for his actions. Trial counsel produced Dr. Kenneth Lorenz as a witness. Dr. Lorenz had treated Robbins for alcohol and cocaine dependency on an in-patient basis some fifteen months

earlier. He both identified the records relating to that hospitalization and gave expert testimony on alcohol-induced hallucinations, the effects of alcohol withdrawal and the nature of alcohol-induced blackouts, which he defined as "a peculiar state that's reported by those who have experienced it as not having recollection — complete or partial recollection, of events that occurred during a period of time while they were under the influence of alcohol acutely." It was clearly trial counsel's strategy, as his closing argument showed, to rely on the theory that "[the defendant] was in a substance induced blackout state [at the time of the killing.]" Counsel on appeal urges that this emphasis, rather than a different emphasis on Robbins's reports of hallucinations and on his insistence that his wife was still alive, amounted to ineffective assistance of counsel. Trial counsel's strategy was not successful, but it was reasonable: the evidence of hallucinations was sparse and Robbins's insistence that his wife was still alive might have been feigned. We believe that this additional evidence, if pressed at trial, "would not likely have influenced the jury's conclusion that, at the time of the killing, the defendant had the mens rea necessary for a conviction of deliberately premeditated murder in the first degree." *Commonwealth* v. *Parker, supra* at 247.[1] Accordingly, we reject this claim as well as the related claim that Robbins should be allowed the opportunity to conduct further discovery and be granted an evidentiary hearing to consider further the effectiveness of trial counsel.

## B

Robbins complains about the instruction on extreme atrocity or cruelty. The bases for his claim of error here are somewhat contradictory: first, that the charge as given allowed the jury to find extreme atrocity or cruelty even in the absence of any of the several factors gleaned from our cases and that the judge set out in her charge; but also that by beginning her list with what the defendant calls the objective factors (the nature

---

[1]The expert testimony indicated that a theory asserting lack of criminal responsibility premised on blackouts is inconsistent with a theory premised on hallucinations. Blackouts occur when a person drinks too much, while hallucinations of the type alluded to by the defendant occur during withdrawal. Defense counsel's decision to rely on the blackout theory coincided with the defendant's own testimony concerning his heavy drinking during the twenty-four hours prior to the murder.

of the wounds and the like), the judge improperly minimized consideration of the last two subjective factors relating to the perpetrator's awareness of the victim's suffering and his indifference to or pleasure in that suffering.

In *Commonwealth* v. *Hunter*, 416 Mass. 831, 837 (1994), we ruled that a jury instruction on extreme atrocity or cruelty was "inconsistent with our case law," in that it "improperly permitted the jury to find extreme atrocity or cruelty without finding that any of the factors [set out in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983)] was present." Although this case went to trial before our decision in the *Hunter* case, Robbins objected to a charge that allowed the jury to find extreme atrocity or cruelty even in the absence of any of the *Cunneen* factors. The objection directly raised the *Hunter* issue, complaining that the instruction is "going on to tell [the jury] that it's not limited to cases involving such evidence" with the resulting vagueness and lack of guidance offered by such an instruction. If there was error in *Hunter*, then there must have been error here as well. Therefore, the conviction of murder in the first degree by reason of extreme atrocity or cruelty must be reversed.

Since the jury specifically found Robbins guilty of murder in the first degree by reason of deliberate premeditation and felony-murder, if the conviction can stand on either of these grounds the error with respect to extreme atrocity or cruelty is harmless, unless it somehow can be said to infect and undermine otherwise proper verdicts on the remaining grounds, requiring either a new trial or a reduction of the charge to second degree murder. See *Commonwealth* v. *Burke*, 414 Mass. 252, 267 (1993) (upholding jury's separate verdict on theory of deliberate premeditation where defendant alleged instructional error on extreme atrocity). See also *Commonwealth* v. *Wallace*, 417 Mass. 126, 134-135 (1994); *Commonwealth* v. *Glass*, 401 Mass. 799, 802-803 n.2, 804 (1988) (possibility of prejudice where, as factual matter, extreme atrocity should not have been submitted to the jury).[2] We conclude that the judge's error was without any such prejudi-

---

[2]Because the jury specified that they found the defendant guilty beyond a reasonable doubt of murder in the first degree by reason of deliberate premeditation, we do not have to speculate on the theory of first degree murder the jury found. Therefore, we do not come up against the issue addressed in *Yates* v. *United States*, 354 U.S. 298, 312 (1957) ("where the

cial effect. The defendant concedes, as he must, that there was no dispute as to the objective factors relating to extreme atrocity or cruelty. The blows were many and gruesome. The victim struggled and lived long enough to stagger from the scene of the attack to another room. When her daughter came to her assistance, she was still alive. And as to the subjective factors, the defendant's principal concern is that whatever errors may have been committed as to the bearing of his voluntary intoxication and mental responsibility on his state of mind as it related to the other grounds of conviction, may have affected the jury's consideration here as well. Since we conclude below that the jury were properly instructed with respect to voluntary intoxication and mental responsibility, there is no reason to speculate that the error in respect to the extreme atrocity or cruelty charge undermined the rest of the verdict.

## C

We reject Robbins's claims relating to the instructions given to the jury on the relevance of voluntary intoxication and on criminal responsibility.

Robbins clearly requested instructions that would allow the jury to consider the effect of voluntary intoxication and mental impairment on every aspect of the charges to which his state of mind was relevant. And the judge complied. In the context of this case, the trial judge's charge was sufficient, and we find nothing else in the jury instructions that would undermine its force.

The judge's instructions on criminal responsibility essentially tracked language we approved in *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967). The charge elaborated on the *McHoul, supra,* instruction, stating that a defendant may be said to lack substantial capacity when "a major portion of the defendant's thinking and rational process does not enable him to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." It might be better if trial judges refrained from such elaborations on formulas that we have approved, since every such departure is sure to

verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected," the verdict shall be set aside). See also *Griffin* v. *United States*, 502 U.S. 46, 56 (1991) (limiting *Yates*); *Commonwealth* v. *Matchett*, 386 Mass. 492, 511 (1982).

become the occasion for a claim of error. In this case nothing of substance was at stake, even if there had been an objection on this point. As there was not, it is quite clear that the departure does not approach a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Pierce,* 419 Mass. 28, 35 (1994).[3]

We also reject Robbins's claim that the judge committed "plain error" by including in her explanation of the consequences of a verdict of not guilty by reason of insanity the statement that in seeking to commit Robbins to a treatment center after such a verdict, the Commonwealth would have the burden of proving beyond a reasonable doubt that he was mentally ill at the time and that his discharge would create a likelihood of serious harm to himself or others. The defendant requested this so-called *Mutina* charge. See *Commonwealth* v. *Mutina,* 366 Mass. 810 (1975). The explanation of the standard of proof of which Robbins complains is not a standard part of such a charge and constitutes "an embellishment with . . . no support whatsoever in the case law." It is, however, entirely accurate. The defendant having asked that the jury be instructed on this matter, we would hesitate a long time before we would fault an instruction that explains it to the jury accurately. See *Commonwealth* v. *Callahan,* 380 Mass. 821, 827 (1980) ("[t]he *Mutina* case does not prescribe any particular wording . . . but requires . . . an instruction . . . which fairly informs the jury of the possible consequences of a verdict of not guilty by reason of insanity"). In any event, trial counsel made no objection on this account, and it does not create a substantial likelihood of a miscarriage of justice.

[3]At trial, the defense did object to the trial judge's explanation that "the words to appreciate . . . is to understand rather than to merely know. . . . So the defendant must not only have an understanding, he must have an appreciation of the criminality of his conduct in that instance." We find no error in this statement. The defendant asserts three other claims: (1) that the judge did not charge that insanity may be inferred from the very act that the defendant committed; (2) that the introduction to the insanity charge used the indefinite singular article ("an issue of insanity has been raised"), thereby improperly suggesting that the inquiry was confined to the blackout evidence discussed by one of the experts; and (3) that the instructions did not adequately explain that even a temporary manifestation of a mental disease or defect might suffice to relieve the defendant of criminal responsibility. We find no error with respect to these claims as well.

## D

The conviction of felony-murder depends on the premise that Robbins "had no right of habitation or occupancy" of the victim's apartment at the time of his forced entry. *Commonwealth* v. *Ricardo*, 26 Mass. App. Ct. 345, 357 (1988) (statutory burglary embodies common law definition of burglary in this respect). See G. L. c. 266, § 14 (1994 ed.). The judge did not elaborate on the criteria for finding that the defendant had no such right. During their deliberation the jury inquired on this score and received the answer from the judge that "[i]t is the Commonwealth's burden to prove beyond a reasonable doubt that the defendant had no right of habitation or occupancy in the apartment at the time of entry." On appeal the defendant raises troubling suggestions that, because he had resided in the apartment with his wife off and on since their marriage, had been allowed to return after being ordered to leave — even after the issuance of a temporary restraining order — had in fact been allowed to return as recently as two days before the killing,[4] and had only been ordered out of the apartment the day before because "it was over," he was therefore, at worst, a tenant at will in the apartment and could not be dispossessed of his tenancy without the benefit of the process provided by law. All this, he now argues, precluded the jury from finding beyond a reasonable doubt that the defendant had no right to be present in the apartment when he entered it on the morning after his wife had ordered him to leave.

The defendant objected that the judge failed to instruct that the defendant had to know that he did not have the right to enter the premises at that time. Given the evidence that would put this matter in issue, the objection was sufficient to raise and preserve it, and the judge considered the matter in a

[4]According to the defendant's testimony, he had been ordered out of the apartment a few days before the murder, and because he had nowhere to go and feeling desperate, he went to his brother's garage where he attempted suicide. He testified that the next thing he knew the police had taken him to a hospital. Two days later he returned to his wife's apartment. He had spent the night at the apartment with her and on the morning of April 17 he made coffee for her before she went to work. He then began painting the kitchen and drinking heavily. It was when his wife returned from work that afternoon that she ordered him out of the house again. He returned to the house at 4 A.M. the next morning, which was when he knew she would usually be showering to leave for work.

detailed and thoughtful memorandum of decision denying the defendant's motion to vacate the verdicts. We are more troubled than reassured by the Commonwealth's response that it would not be in the public interest to remove from the reach of a burglary prosecution an intrusion by a former cohabitant who had never been formally evicted. The judge's memorandum acknowledges that the question "whether [the defendant] had a legal right to occupy [the premises] on the morning in question is a close call," and that "the courts of the Commonwealth have never specifically ruled on this issue." She goes on to note that other States have ruled "in virtual unison, that the marital relationship alone does not give one spouse the right to intrude into the other spouse's residence and to terrorize that spouse." The cases adduced by the judge, while responding to the same need to provide security to the spouse that we recognize here, present more sharply defined legal issues. In *White* v. *State*, 587 So. 2d 1218, 1223-1227 (Ala. Crim. App. 1990), aff'd, 587 So. 2d 1236 (Ala. 1991), cert. denied, 502 U.S. 1076 (1992), the victim had filed for divorce and the defendant, pursuant to a negotiated settlement, had moved out of the marital dwelling, of which prior to her marriage the victim had been the sole owner. In *Parham* v. *State*, 79 Md. App. 152, 161 (1989), the husband and wife had been separated for six weeks (the husband having spent only a week in the dwelling before the separation), and she was in the process of purchasing the marital residence in her own name. The court also noted that arguing against the husband's claim of a possessory interest was the method by which he had effected entry — throwing a brick through a window and unlocking it. *Id.* at 161 n.3. In this respect *Parham* resembles this case. In *Cladd* v. *State*, 398 So. 2d 442, 443 (Fla. 1981), the wife had been separated and living apart from her husband for six months, although there was no formal separation agreement. In *Knox* v. *Commonwealth*, 225 Va. 504, 505 (1983), the husband and wife had been living apart for six months. The court stated that the husband had no right to enter his estranged wife's premises where she had been "living apart from her husband in her own dwelling, one in which he has no proprietary interest." *Id.* at 507. In this case, the jury heard testimony that the victim had lived in the apartment before her marriage to Robbins, and when Robbins was asked on direct ex-

amination where he lived after he married her, he replied, "at [his wife's] apartment," which is the same apartment where the killing took place. Moreover, throughout his testimony, Robbins indicated that he had always acquiesced in his wife's decisions that he leave the apartment and returned only because she permitted it. On the other hand, Robbins had been painting the kitchen during the prior two weeks and passed the previous night with his wife in the apartment.

We agree with the Commonwealth that this issue exposes a gap in our law insofar as it may fail clearly to protect the expectations of security of a person in the victim's situation. But if neither the judge nor the Commonwealth could come up with a definitive rule marking out when a person no longer has the right to enter premises in which he had lived only the day before, then it cannot be the role of the jury, considering all the circumstances, to reach that determination without further guidance. And certainly the defendant was correct to insist that the judge at least charge the jury that they must find that "the defendant knew that he had no right to enter . . . that premises." If the judge was perplexed as to the line that delineates the underlying legal rights, how can it not be prejudicial error to deny the defendant the benefit of jury instructions on this matter where the defendant too may have been of at least two minds on this account? See *Commonwealth* v. *Key*, 381 Mass. 19, 27 (1980) (defendant entitled to instruction that clearly presents issues of fact and carefully explains applicable law). In the future in a case such as this, the judge should instruct the jury regarding factors that bear on a defendant's right to enter. These include the marital status of the parties,[5] the existence of any legal orders against the defendant, extended periods of separation, the names on leases or documents of title, the acknowledgment by the defendant that he has no right to enter the premises, and the method of entry. If such an instruction had been given in this case, the evidence may well have been sufficient to sustain the verdict, but as it is we cannot allow the conviction on this

---

[5]A marital relationship does not preclude a conviction of burglary. See *Parham* v. *State*, 79 Md. App. 152, 162-163 (1989) (discussing cases from various States and concluding that "[t]he common thread running through these cases is that the mere existence of a marriage relationship does not put a spouse's separate property beyond the protection of the law and subject to the depredation of the other spouse").

ground to stand. The conviction for armed burglary must also be reversed.[6]

## E

The conviction of first degree murder need not depend on the verdict of felony-murder, however, because Robbins was separately convicted of murder in the first degree by reason of deliberate premeditation. The defendant made no objection directed specifically to this ground of conviction, except as he generally complains about the disposition of his claims regarding insanity, mental impairment, voluntary intoxication, the charges regarding specific and general intent,[7] and the meaning of reasonable doubt.[8] Having disposed of these claims, we find no ground to overturn the conviction based on this last ground. The evidence amply supports the verdict of deliberate premeditation. See *Commonwealth* v. *Judge*, 420 Mass. 433, 441 (1995) ("[d]eliberate premeditation requires specific intent — that the defendant act with the intent that his actions will cause death and that he acted with sufficient time [even if fleeting] to reflect on that consequence" [footnote and citation omitted]). There was testimony of angry death threats and accusations when his wife ordered him out of the house the previous evening. The evidence supports the conclusion that Robbins took the knife with which he stabbed his wife from the kitchen of the apartment where he had rested before

[6]Because we reverse the burglary conviction on this ground, we do not reach the defendant's argument that the Commonwealth did not prove beyond a reasonable doubt that the breaking and entering occurred during the nighttime.

[7]The defendant complains that the language the judge used to distinguish specific intent from general intent improperly eased the Commonwealth's burden, by suggesting that anything more than reflex action will count as specific intent. We do not read the charge as a whole as carrying any such implication. Especially as it related to first degree murder by reason of deliberate premeditation, the charge particularly required that "the Commonwealth must prove that the defendant [must have] thought before he acted. That is, that the defendant formed a plan to murder after deliberation."

[8]The defendant complains that the judge twice used the term "moral certainty" in explaining the notion of reasonable doubt. The charge was fully in accord with our decision in *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), which we have never disapproved. See *Commonwealth* v. *Pinckney*, 419 Mass. 341, 342-347 (1995). The recent decision of the Supreme Court in *Victor* v. *Nebraska*, 114 S. Ct. 1239 (1994), concluded that such language was not constitutionally infirm.

returning to his wife's apartment. He silently gained entry to the apartment by slashing the screen, opening the outer door, and using a key he had obtained the previous day to open the inner door. He came at a time when he knew his wife would probably be showering to go to work. As he passed her daughter's room on his way to the bathroom, he closed her door. While the child heard the sounds of the struggle, she did not testify to any argument that may have preceded the attack. Although Robbins testified that he had no memory of the attack, he did not suggest that he had any other purpose in seeking out his wife, and the jury might readily have concluded that he had a plan to come back to the apartment in order to kill his wife. When he had been told to leave the apartment several days earlier he had attempted suicide. Now the break may have seemed definite to him. It appears that his wife intended it to be final and intended him to know it. Thus, if the jury rejected the claims that the defendant was substantially impaired mentally at the time of the attack and also rejected the claim that voluntary intoxication had removed his ability to deliberate, their conclusion that he had acted with deliberate premeditation was fully justified.

### III

We have considered the record as a whole and find no reason to exercise our authority under G. L. c. 278, § 33E, either to order a new trial or to reduce the charge to murder in the second degree. The errors in the charge in respect to extreme atrocity or cruelty and felony-murder could not have prejudiced the jury's consideration of the remaining charge of first degree murder by reason of deliberate premeditation. The evidence was more than sufficient to sustain that charge.

The judgment of conviction of murder in the first degree by reason of deliberate premeditation is affirmed. The judgment of conviction of armed burglary is reversed and the verdict is set aside.

*So ordered.*