## Commonwealth *vs.* Rodney Pittman.

No. 01-P-1245.

Suffolk. January 21, 2003. - December 11, 2003.

Present: Perretta, Cowin, & Green, JJ.

*Armed Home Invasion. Assault and Battery by Means of a Dangerous Weapon. Intimidation of Witness. Witness,* Intimidation, Unavailability. *Evidence,* Absence of witness, Unavailable witness, Previous testimony of unavailable witness. *Practice, Criminal,* Continuance.

At the trial of indictments charging the defendant with armed home invasion, assault and battery by means of a dangerous weapon, and intimidation of a witness, the judge erred in denying the defendant's request for admission in evidence of a witness's prior recorded testimony, where the defendant made a sufficient showing of the unavailability of the witness; this error required reversal of the convictions, because this court could not say with any degree of assurance that the witness's testimony would not have changed the outcome of the trial. [168-171]

This court, having ordered the retrial of indictments charging the defendant with armed home invasion, assault and battery by means of a dangerous weapon, and intimidation of a witness, discussed the scope of the retrial [171-172] and issues likely to recur [172].

Indictments found and returned in the Superior Court Department on February 10, 1999.

The cases were tried before *James D. McDaniel, Jr.,* J.

*Robert F. Shaw, Jr.,* for the defendant.

*Susanne Levsen Reardon,* Assistant District Attorney, for the Commonwealth.

Perretta, J. On appeal from his convictions of armed home invasion, assault and battery by means of a dangerous weapon, and intimidation of a witness, the defendant's principal argument is that the trial judge erred in refusing to continue the trial in order to secure the presence of a defense witness, whose testimony would have directly contradicted that of the victim in crucial respects, while also refusing to allow that witness's prior

recorded testimony in evidence.[1] We conclude that, because the defendant demonstrated the unavailability of the witness, it was error for the judge to deny the defendant's alternative requests for a continuance or the admission in evidence of the witness's recorded testimony given at the defendant's second trial. See note 1, *supra.* Because we cannot say with any degree of assurance that the witness's testimony would not have changed the outcome of the trial, we reverse the convictions.

1. *The evidence.* We set out in detail the evidence presented at the defendant's third trial. In the fall of 1998, the defendant shared an apartment in the Dorchester section of Boston with his fiancée Martha and her teenaged daughter Diane.[2] Martha and the defendant had been engaged to marry since 1992,[3] and she, Diane, and the defendant had lived together in the apartment as a family for more than six years. Although the lease for the apartment identified only Martha and Diane as tenants, the defendant had keys to the apartment, received his mail at that address, and considered it his home. While Martha paid most of the monthly bills, which were in her name and directed to her, the defendant contributed some money toward the household expenses. He also made those payments necessary to maintain and to insure his automobile, which served as the family's primary mode of transportation.

In late September of 1998, the defendant entered into a clandestine sexual relationship with Diane. As put by the defendant, he and Martha had become "distant" from each other, and he wanted to end their relationship. At this time, he was thirty-nine years of age to Diane's seventeen years. The defendant testified that, between September and mid-November of 1998, and while Martha was at work, he and Diane had consensual sexual intercourse in their home three times. He

---

[1]This appeal comes before us after the defendant's third trial. The first trial ended in a mistrial after a witness physically attempted to attack the defendant in view of the jury. The second trial began within a few days after the declaration of mistrial and concluded with the defendant's acquittal on a kidnapping indictment and a hung jury on the remaining charges. At the third trial, the defendant was acquitted of rape.

[2]Martha and Diane are pseudonyms.

[3]The defendant testified that he and Martha became engaged in 1996. The year of their engagement is irrelevant.

related that, as their affair progressed, Diane began demanding that he pay her bills and run errands for her. She caused friction in their relationship and tension in the household by threatening to tell Martha about their relationship if he did not do as she asked. The defendant felt as if he were "walking on eggshells."

Soon after Martha left for work on the morning of December 6, 1998, Diane invited the defendant into her bedroom and expressed her desire to engage in sexual intercourse. The defendant described how he attempted intercourse with Diane for a few minutes but then stopped. He told Diane that he was reluctant to continue the sexual nature of their relationship, that he could no longer endure the tension in the household, and that, when Martha came home from work, he was going to tell her "everything." He testified that Diane told him that she did not want her mother to know about their relationship, that "if anything, I'd rather tell her that you raped me." Diane then telephoned her mother at work and asked her to come home.[4] As the defendant was leaving the building, Martha drove up in the "family" car. When she asked why Diane had called her to come home, the defendant told her that Diane wanted to talk to her and walked away.

Martha testified that, when she encountered the defendant and asked what was happening, he told her that he was sorry and walked away. Diane, visibly upset, met her mother at the back door to the building and told her that the defendant had put his penis in her vagina. They went to their apartment, and Diane showered. Martha and Diane next went to the home of the defendant's parents and then to a hospital for a "rape kit examination."[5] That afternoon, the police obtained a warrant for the defendant's arrest. In the meantime, the defendant had admitted himself to the psychiatric ward of a local hospital without notifying anyone of his whereabouts.

Martha told the jury that on the following day, December 7, she changed the lock on the door to the apartment, packed up the defendant's belongings, and brought them to his parents'

[4]Martha worked at a nearby rest home owned and managed by the defendant's parents who also lived there.

[5]The examination yielded a semen sample which, through subsequent deoxyribonucleic acid (DNA) testing, was linked to the defendant.

residence at the rest home that they owned and managed. According to Martha, she was greeted at the door by Jacqueline Greer, who resided and worked at the rest home. Martha related that Greer helped her carry the defendant's belongings to a second-floor bedroom. A few days later, Martha left the defendant's car with his parents and purchased one of her own. Because the defendant was "nowhere to be found," she could not tell the defendant about any of the steps she had taken to remove him and his property from the apartment. Four days later, December 11, the defendant was arrested at the hospital and charged with raping Diane. He was taken to a police station and released the next day. When he went to his parents' home, he saw his car. He had "no idea" how it got there.

We come to the events of Sunday, December 13, 1998. Martha testified that, at about 10:00 A.M., she and Diane were leaving their apartment to go Christmas shopping. When she opened the front door to the apartment, she found a suit which she had previously purchased for the defendant "ripped to shreds" and the duffel bag that she had brought to his parents' home on December 7. She also found a note on the windshield of her new car. The note read as follows: "[Martha], the truth is I love only you. Now I know that . . . anything else is a waste of time and effort and mistake. You'll realize the truth about [Diane]. I tried to tell you. I still love you."[6] Martha retrieved the suit and duffel bag and dropped them off at the police station. She and Diane then went shopping and arrived home at about 6:00 P.M. After unloading the bundles, Martha left Diane in the apartment, returned to her car, drove to her parking space behind the building, re-entered the building through the rear door, and walked up one flight of stairs to her apartment.

Martha told the jury that, as she put her key in the door to her apartment, she heard a noise behind her. She turned and saw the defendant. He was wearing a dark-blue baseball hat and carrying a knife which she recognized as one frequently used at his parents' home. The defendant put his foot between the door and its threshold and said, "I got you now, bitch." He pushed her inside the apartment, shut and locked the door, and pulled the

---

[6]The defendant testified that he left the note on the windshield of the "family" car on December 6.

telephone from its socket. Still wielding the knife, the defendant grabbed Martha by her arm, dragged her into a bedroom, and pushed her into a chair.

According to Martha, the defendant acted "deranged." An argument ensued. The defendant told Martha that, although he had had sex with Diane, he had not raped her. Martha insisted that Diane's willingness made no difference to her, he had "hurt an innocent kid." He told Martha that his parents had paid a large amount of money to "get him out of this mess" and that his life would be ruined if the charges were not dropped.[7] As he was talking, the defendant jabbed with his knife, hitting a dresser as well as Martha's knees. He sliced open Martha's hat and a pillow sham. When he sliced Martha's finger while wildly waving the knife, he said, "I didn't mean to do this . . . . I was only trying to scare you."[8] He insisted upon driving her, in her car, to a health center for medical assistance. Upon their arrival and while in the defendant's presence, Martha explained that she had cut her hand while cooking. Once alone with a nurse, Martha changed her explanation for her injury and said that the defendant had cut her. She also called the police and her family. By the time she had received medical attention, the defendant had left the health center. The police drove Martha home. Her car was parked behind her apartment building.

Upon cross-examination, Martha readily admitted that she had been angry with the defendant from the time of Diane's allegation of rape. She was of the view that the relationship between the defendant and Diane, consensual or not, was wrong.

The defendant's version of the events of December 13 is quite different. He related that he arrived at his parents' house that morning and accompanied his mother to church, a fact corroborated by his mother. When they arrived home from church, about 3:00 P.M., Greer told him that Martha had called for him while he was at church. The defendant testified that, about two hours later, while still at his parents' home, he received a telephone call from Martha. Greer answered the phone and then

---

[7]Martha's recollection of the defendant's somewhat incoherent statements was refreshed with a transcript of her previous testimony. See note 1, *supra.*

[8]While the defendant and Martha were in the bedroom, Diane remained in the living room holding a baseball bat.

handed it to him. Although the defendant was not allowed to relate their conversation,[9] he was permitted to state that he and she agreed to meet and talk.

We digress. Martha testified that she never made a telephone call to the Pittmans' home on December 13, and her sister testified that it was she, and not Martha, who placed the call and spoke with Greer.

According to the defendant, he met with Martha, as agreed, in the parking lot behind her apartment building. Having once worked as a mechanic, he inspected her newly purchased car. Because he and Martha did not want their conversation to be overheard, they went to her apartment. The defendant acknowledged Diane, who was watching television in the living room, and followed Martha into a bedroom. There they talked about where he had been and why, as well as the criminal charge he was facing as a result of Diane's accusation of rape. After about fifteen minutes, he and Martha left the bedroom and went into the kitchen so that Martha could begin preparing dinner for herself and Diane. When Martha stuck a knife into frozen hamburger to check whether it had defrosted, she sliced her thumb. The defendant explained that he and Martha decided that she should seek medical attention in case the knife had been contaminated by raw meat.

The defendant testified that upon arrival at the medical center, he assisted Martha in requesting medical attention. When he was told to wait in the reception area of the center while Martha was being treated, he left. He dropped off Martha's car at her apartment, went to a friend's house, and called his parents. When his parents told him that the police were looking for him, he drove to their home. Upon his arrival, he called the police. He was soon taken into custody.

In the course of his testimony, the defendant explained that he first learned that Martha had changed the lock on the door to her apartment when he and she were in the bedroom talking. He denied that he went to her apartment with a knife; that he threatened, grabbed, or yelled at her; or that he had shredded the suit she had purchased for him.

---

[9]The judge sustained the Commonwealth's objection to the inquiry calling for the defendant's testimony as to the contents of this conversation.

2. *Greer's prior recorded testimony.* At the defendant's second trial, which ended with a hung jury on the charges now before us, Greer testified that she never saw Martha deliver any bags of clothing to the defendant's parents' home in December of 1998, nor did she ever receive such items from Martha. She did, however, see the defendant at his parents' home on Sunday, December 13, at about 9:30 A.M., when he was preparing to attend church with his parents.

Greer also related that, on December 13, she received two telephone calls from Martha. Although Greer was uncertain about the time of Martha's first call, she stated that the conversation concerned Martha's inquiry whether the defendant was then at his parents' home. No matter the exact time of Martha's call, Greer told Martha that the defendant was not at his parents' home. Greer took a second call from Martha a little after 2:00 P.M., soon after the defendant returned from church. Martha asked to speak with the defendant, and Greer handed him the phone. Greer stated that, shortly thereafter, the defendant left the premises. Before he did so, Greer told him, "Rodney, don't go out." The defendant replied, " 'I'll be back. Everything is okay; she just wanted to talk.' "

When, during her testimony, Greer was shown a knife, she stated that she was familiar with the cutlery used at the rest home and that she had never seen anything like that knife there. She also testified that when the defendant left his parents' home, he was not carrying anything in his hands. She was also insistent about the fact that the two telephone calls that she received on December 13 were from Martha and not one of Martha's sisters.[10]

Greer did not testify at the third trial. She was in Virginia attending her grandmother's funeral. The primary issue on appeal is whether the judge was correct in rejecting defense counsel's requests either to continue the trial until Greer's return from

_____

[10]It should be recalled that Martha testified at the defendant's third trial that, when the defendant came to her apartment on December 13, he was brandishing a knife which she recognized as being from the kitchen of his parents' home and that she never made any telephone calls to the defendant on December 13. Martha's sister told the third jury that it was she, and not Martha, who had placed the calls and had spoken with Greer on that day.

Virginia or to be allowed to read Greer's prior recorded testimony to the jury.

3. *Discussion.* Because we conclude that the judge was in error in ruling that defense counsel had failed to show that Greer was an unavailable witness, and, consequently, in excluding her prior testimony, we do not consider the denial of defense counsel's request for a continuance. Instead, we focus on the judge's ruling that defense counsel had failed to make a sufficient showing of Greer's unavailability. "We accept as a basis of unavailability the principles expressed in Rule 804(a)(5) of the Federal Rules of Evidence [1987]. Rule 804(a)(5) provides that a witness is unavailable if the witness 'is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means.' " *Commonwealth* v. *Charles*, 428 Mass. 672, 678 (1999). See *Commonwealth* v. *Rodriquez*, 58 Mass. App. Ct. 610, 619 (2003), and cases therein cited.

It appears on the record before us that, on the morning of June 30, 2000, a Friday and the fourth day of trial, defense counsel advised the judge that Greer was in Virginia but due to return in time to be present in court on July 6. He requested a continuance until that date. The judge deferred his ruling on the request until later that day, after the close of the Commonwealth's case. At that time, defense counsel gave the judge a copy of the subpoena ordering Greer to appear at trial and represented that it had been served in hand upon Greer at her last and usual place of abode the day before, just as she was about to leave for Virginia.[11] Defense counsel also made an offer of proof showing the necessity of Greer's testimony to contradict that given by Martha. The judge refused to continue the trial. The following Monday, July 3, defense counsel renewed his request for a continuance.

In pressing his request for a continuance, defense counsel represented to the judge that he had been in contact with Greer

---

[11]The subpoena ordering Greer to appear on June 29 and 30 was dated June 27, 2000. The return of service was dated June 28, 2000. To the extent the judge noted that the return failed to indicate where service had been made upon Greer, neither the judge nor the Commonwealth disputed defense counsel's representation that Greer had been served at her last and usual place of abode.

on Friday, June 30, and that she told him that she would be present in court to testify the following Monday, July 3. Defense counsel went on to represent that, notwithstanding Greer's assurances to him, the defendant's family notified him over the weekend that Greer had made four or five unsuccessful attempts to secure passage on a flight back to Boston in time to appear in court on Monday. Defense counsel renewed his offer of proof and again requested a continuance until Thursday, or, as put by him, "an extra day and a half [to] two days," taking the Fourth of July holiday into account. Citing concern for the jurors' convenience, the judge again denied the request for a continuance. But see *Commonwealth* v. *Pyne*, 35 Mass. App. Ct. 36, 40 (1993) (in view of circumstances presented, refusal to grant continuance deemed a "short-sighted insistence on expedition").

Faced with Greer's absence and the judge's refusal to grant a continuance, defense counsel next asked that he be allowed to read Greer's prior recorded testimony from the second trial to the jury. Although the judge neither questioned nor otherwise expressed doubt about defense counsel's representations concerning his efforts to secure Greer's attendance, he (the judge) found that he had no way of knowing whether Greer had or had not made reasonable effort to make a timely return from Virginia.[12] Consequently, he refused to allow defense counsel to read Greer's prior recorded testimony to the jury, stating that defense counsel had failed to make a sufficient showing of Greer's unavailability.

It was error for the judge to base his ruling upon a lack of proof of Greer's actual attempts to be present at trial, rather than upon defense counsel's unchallenged representations

---

[12]The judge stated the following:

> "This witness — you indicate to me that this witness made efforts to get here. . . . I have no way of knowing whether she did or not or what efforts she, in fact, did make to get here. I have no means of knowing whether or not — I assume she did go to a funeral. But whether or not she can't get back here or there's no flights absolutely anywhere in the world getting her back here, I don't know. But I intend to proceed with the trial. . . ."

concerning all his reasonable efforts to secure her presence. See *Commonwealth* v. *Charles*, 428 Mass. at 678; *Commonwealth* v. *Rodriquez*, 58 Mass. App. Ct. at 619. The Commonwealth makes no argument to the contrary. The undisputed facts establish that defense counsel made timely service of a subpoena upon Greer which she ignored in favor of attending a family funeral; he spoke with her in Virginia; he secured her assurance that she would be in court on July 3; and he subsequently spoke with her family concerning her inability to return to Massachusetts by that date.

Because the judge concluded that the defendant had failed to show that Greer was an unavailable witness, he did not reach the question of the reliability of Greer's prior statements. The Commonwealth commendably concedes the issue, and we accept the concession. A review of the transcript of Greer's testimony at the defendant's second trial establishes the reliability of her prior recorded statements. "Prior recorded testimony is admissible 'in a proceeding addressed to substantially the same issues as in the current proceeding, with reasonable opportunity and similar motivation on the prior occasion for cross-examination of the declarant by the party against whom the testimony is now being offered.' *Commonwealth* v. *Trigones*, 397 Mass. 633, 637-638 (1986), quoting *Commonwealth* v. *Meech*, 380 Mass. 490, 494 (1980)." *Commonwealth* v. *Johnson*, 435 Mass. 113, 135 (2001).

Having concluded that the judge erred in excluding evidence of Greer's prior recorded statements, we now consider whether the error requires reversal of the defendant's convictions. On this issue the Commonwealth argues that, because Greer did not witness any of the events which allegedly took place at Martha's apartment on December 13, her testimony was, at best, "merely corroborative" of the defendant's claim that Martha had called him twice on the date in question. Accordingly, the Commonwealth argues, the erroneous exclusion of her prior recorded testimony does not require reversal of the convictions. We do not agree.

"An error is not prejudicial only if the Commonwealth can show 'with fair assurance . . . that the judgment was not substantially swayed' by it. *Commonwealth* v. *Flebotte*, 417

Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983)." *Commonwealth* v. *Rosado*, 428 Mass. 76, 79 (1998). This trial was a credibility contest in which the Commonwealth's case turned on the testimony of Martha and Diane.

We think it apparent from the evidence and the defendant's acquittal on the charge of rape (see note 1, *supra*) that the jury could not have accepted all of Diane's testimony. As for the remaining charges, they had to have relied on Martha's testimony, testimony corroborated by her sister and Diane. They did not, however, have Greer's testimony. Greer's prior testimony, see part 2 of this opinion, *supra*, did much more than corroborate the defendant's insistence that Martha had called him twice on December 13, a claim adamantly denied by Martha. It had a direct bearing on the defendant's purpose in going to Martha's apartment that day. Moreover, Greer contradicted Martha's testimony concerning the return of the defendant's possessions on December 7, as well as her claim that the knife in question came from the defendant's parents' home.

When the jury at the defendant's second trial had Greer's testimony to consider on the indictments before us, they were unable to reach a verdict. See note 1, *supra*. Based upon the procedural history of the case and the evidence presented at the trial now under review, we cannot say that Greer's prior recorded testimony "could not have affected the . . . verdicts that are challenged on appeal," *Commonwealth* v. *Ross*, 426 Mass. 555, 560 (1998), especially the verdict returned on the indictment charging him with armed home invasion. The error was prejudicial and requires yet another trial.

3. *Scope of the retrial.* Our conclusion that the defendant must be put to trial for the fourth time requires that we consider his argument that he was entitled to required findings of not guilty on the indictments charging him with armed home invasion and intimidation of a witness. His argument on both claims fails to take into account Martha's testimony which must be viewed in the light most favorable to the Commonwealth. See *Commonwealth* v. *Cowans*, 52 Mass. App. Ct. 811, 815 (2001),

and cases therein cited.[13]

4. *Issues likely to recur.* Having concluded that the defendant is entitled to a new trial, we briefly discussed those issues likely to recur. First, there is the matter of the admissibility of the restraining order obtained by Martha pursuant to G. L. c. 209A several days after Diane's allegations that the defendant had raped her and served upon the defendant on December 14, the date after the crimes in issue. Whether at retrial the order should be admitted in or excluded from evidence turns on whether the Commonwealth first shows that the defendant had actual or constructive knowledge of the order (see *Commonwealth* v. *Delaney,* 425 Mass. 587, 589-593 [1997], cert. denied, 522 U.S. 1058 [1998]; *Commonwealth* v. *Molloy,* 44 Mass. App. Ct. 306, 306-308 [1998]; *Commonwealth* v. *Crimmins,* 46 Mass. App. Ct. 489, 491-494 [1999]), and, should such a showing be made, whether the trial judge determines, as matter of discretion, that the probative value of the order outweighs its potential for prejudice. We do not consider whether the defendant's credibility is subject to impeachment by his prior convictions. That question will be a matter within the trial judge's discretion.

Rather than discuss the defendant's complaints about the jury instructions, we direct the attention of the judge on remand to *Commonwealth* v. *Robbins,* 422 Mass. 305, 315 (1996).

*Judgments reversed.*

*Verdicts set aside.*

---

[13]We see nothing in *Commonwealth* v. *Robbins,* 422 Mass. 305, 314-315 (1996), that supports the defendant's claim of an entitlement to a required finding of not guilty on the armed home invasion indictment as opposed to appropriate jury instructions on the question of an armed home invasion by a "former cohabitant who had never been formally evicted." *Id.* at 314. We also conclude that the Commonwealth's evidence was sufficient to support its burden of proof on the defendant's conviction for intimidating a witness. See G. L. c. 268, § 13B. A jury reasonably could infer that Martha was a person "furnishing information" to the police concerning Diane's allegation of rape. *Ibid.* Moreover, the Commonwealth presented evidence to show "express or implied" threats of force by the defendant in order to influence or to intimidate Martha with respect to her furnishing information about the alleged rape to the police. *Ibid.* See *Commonwealth* v. *Burt,* 40 Mass. App. Ct. 275, 278 (1996); *Commonwealth* v. *McCreary,* 45 Mass. App. Ct. 797, 800 (1998).