995 A.2d 791

**Antoine Levar GRIFFIN**

v.

**STATE of Maryland.**

**No. 1132 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

May 27, 2010.

Katherine P. Rasin (Elizabeth I. Julian, Acting Public Defender, on the brief), Baltimore, MD, for Appellant.

Robert Taylor, Jr. (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: HOLLANDER, WOODWARD and KEHOE, JJ.

HOLLANDER, Judge.

A jury in the Circuit Court for Cecil County convicted Antoine Levar Griffin, appellant, of second degree murder, first degree assault, and use of a handgun in the commission of a felony or crime of violence. The convictions arose from the fatal shooting of Darvell Guest on April 24, 2005.[1]

---

1. Appellant was sentenced to thirty years for the murder conviction and to a consecutive term of twenty years for the handgun offense. The assault conviction merged into the murder conviction.

On appeal, Griffin poses three questions, which we have rephrased slightly:

I. Did the trial court err in admitting a page printed from a MySpace profile alleged to be that of appellant's girlfriend?

II. Did the trial court err in permitting the prosecutor to incorrectly describe "reasonable doubt" in his rebuttal closing argument?

III. Did the trial court err in denying appellant's request for a mistrial following an outburst by the mother of a witness?

For the reasons set forth below, we shall affirm the convictions.

## I. FACTUAL SUMMARY[2]

In the early morning hours of April 24, 2005, Darvell Guest was cornered, unarmed, in the women's bathroom of Ferrari's Bar in Perryville, where he was brutally shot seven times. Appellant was charged with the murder. Griffin's first trial was held in August 2006. At that trial, Dennis Gibbs, appellant's cousin and an eyewitness to Guest's murder, testified that he did not see appellant pursue the victim into the bathroom with a gun. The trial ended in a mistrial.

At appellant's second trial in January 2008, several witnesses testified that they saw appellant with a handgun just before the shooting, and others testified that they witnessed appellant pursue Guest into the women's bathroom, where appellant fired his weapon. Gibbs testified that appellant was the only person, other than Guest, in the bathroom when the

---

2. Numerous witnesses testified during the course of the seven-day trial. Because appellant has not challenged the sufficiency of the evidence, however, we shall include "only the portions of the trial evidence necessary to provide a context for our discussion...." *Washington v. State*, 180 Md.App. 458, 461–62 n. 2, 951 A.2d 885 (2008); *see Singfield v. State*, 172 Md.App. 168, 170, 913 A.2d 671 (2006), *cert. denied*, 398 Md. 316, 920 A.2d 1060 (2007); *Martin v. State*, 165 Md.App. 189, 193, 885 A.2d 339 (2005), *cert. denied*, 391 Md. 115, 892 A.2d 478 (2006).

shots were fired. According to Gibbs, another cousin, George Griffin, was standing "right with me" during the shooting and did not enter the bathroom. He explained the discrepancy in his testimony at the two trials, claiming that Jessica Barber, appellant's girlfriend, had threatened him prior to the first trial.

Thereafter, the court permitted the State to introduce into evidence a redacted printout obtained in December 2006 from a MySpace profile page allegedly belonging to Ms. Barber. The profile page, introduced for the limited purpose of corroborating Gibbs's testimony, said, in part: "JUST REMEMBER, SNITCHES GET STITCHES!! U KNOW WHO YOU ARE!!"

We shall include additional facts as they pertain to our discussion of the issues.

## II. DISCUSSION

### A.

Appellant contends that the court erred in admitting the MySpace evidence. He complains that the evidence was not properly authenticated and that its prejudicial effect outweighed its probative value.

Before reviewing the parties' contentions in more detail, we pause to set forth additional facts.

At the second trial, Gibbs recalled that he arrived at Ferrari's in the company of three of his cousins, Dorian Griffin, Dyrle Griffin, and George Griffin. According to Gibbs, Guest bumped into Dorian, and the two "exchanged a few words." They quickly shook hands, however, then "parted ways," without further incident. A few minutes later, according to Gibbs, he saw appellant run up and punch Guest in the face. In response, the victim's girlfriend, Kesha Bowser, grabbed appellant. A "commotion" with physical "tussling" ensued, during which appellant pulled a black handgun "from his hip" and held it out "[s]traight in front of him," pointing it "[t]owards Mr. Guest." Guest ran into the women's bathroom, and

appellant followed. Although Gibbs could not see inside the restroom, he testified that he saw both Guest and appellant go into the bathroom, and that no one else went in. Gibbs then heard multiple gunshots.

Gibbs conceded that his testimony at the second trial as to who entered the bathroom before the shots were fired was inconsistent with what he told police and with his testimony at the first trial. He acknowledged that, at the first trial, he had testified that appellant was outside the bathroom while the victim was in the bathroom, that he did not see appellant go into the bathroom with Guest, and that he saw his cousin, George Griffin, exit the bathroom.

On re-direct, the prosecutor asked Gibbs to explain the "inconsistencies between your testimony here in this trial and some of your earlier statements." Gibbs replied:

I had been threatened. Like right after the stuff happened I was threatened by people from across the bridge that knew Mr. Guest. That's why I couldn't go back to work. And **then right before the last [trial] I was threatened by Antoine's girlfriend. She told me I might catch a bullet if I showed up in court[.]** (Emphasis added.)

On re-cross, the following exchange ensued:

[DEFENSE COUNSEL]: Did you see George Griffin come out of the bathroom?

[MR. GIBBS]: No, sir.

[DEFENSE COUNSEL]: Did you tell under oath and swear to a jury that you did see him come out of the bathroom?

[MR. GIBBS]: Yes, sir . . . .

[DEFENSE COUNSEL]: Now you said that the reason that you are giving inconsistencies or . . . lies . . . would be because his girlfriend threatened to you that you were going to get a bullet?

[MR. GIBBS]: Yes, sir; and I have a witness.

[DEFENSE COUNSEL]: When was that, sir?

[MR. GIBBS]: It was like the week before the trial.

[DEFENSE COUNSEL]: Where was that?

[MR. GIBBS]: Me and my sister was right out in front of her house, and her and my sister and Jesse was on the phone together, and she was like—

[DEFENSE COUNSEL]: Just listen. I'm talking to you. I said where did you get that, not your sister.

[MR. GIBBS]: From the phone.

[DEFENSE COUNSEL]: You spoke to somebody on the phone?

[MR. GIBBS]: My sister was on the phone with her.

[DEFENSE COUNSEL]: Sir, did you tell the state's attorney?

[MR. GIBBS]: Yes, on the first case, yes, I did tell whoever the state's attorney was. I did tell him that morning....

[DEFENSE COUNSEL]: When did you tell this state's attorney?

[MR. GIBBS]: Today.... Because you didn't let me finish answering my question when you had asked me, and I said there was a reason behind everything.... I wanted to finish my statement, but you didn't let me.

The State also called Ms. Barber. She testified that, on the night in question, appellant was her boyfriend, and he lived with her and their two children. Ms. Barber identified appellant's nickname as "Boozy." Although Ms. Barber was at Ferrari's at the time of the shooting, she did not arrive with appellant, and claimed that she was not with him during the evening. According to Ms. Barber, she heard gunshots at the bar but did not see appellant in the bar after the shooting.

On the day after Ms. Barber testified, the prosecutor sought to introduce five pages printed on December 5, 2006, from an Internet Web site[3] for a MySpace profile in the name of "SISTASOULJAH," who was described on that Web page as a 23 year-old female from Fort Deposit. The profile page listed the member's birthday as "10–2–83." It also contained

---

3. The term "Web" is a shorthand reference to the World Wide Web.

a photograph posted next to the description, showing a "three-quarter view" of an embracing couple. Counsel and the court agreed that the couple appeared to be appellant and Ms. Barber. A "blurb" posted on the profile stated as follows:

I HAVE 2 BEAUTIFUL KIDS.... FREE BOOZY!!!! JUST REMEMBER SNITCHES GET STITCHES!! U KNOW WHO YOU ARE!!

The State offered the printout to rehabilitate Gibbs's credibility, and to bolster Gibbs's claim that Ms. Barber had threatened him before the first trial. Defense counsel objected, arguing that the State had not sufficiently established a "connection" to Ms. Barber, and had failed to question her about the MySpace profile. In response, the prosecutor asserted that the profile could be authenticated as belonging to Barber through the testimony of Sergeant John Cook, the Maryland State police investigator who printed the document.

The trial court then allowed defense counsel to voir dire Sergeant Cook, outside the presence of the jury. The following transpired:

[DEFENSE COUNSEL]: How do you know that this is her web page? ...

[SGT. COOK]: Through the photograph of her and Boozy on the front, through the reference to Boozy, to the reference of the children, and to her birth date indicated on the form.

[DEFENSE COUNSEL]: How do you know she sent it?

[SGT. COOK]: I can't say that.

Sergeant Cook acknowledged that he could not determine when any particular posting was made. But, he indicated that he visited the Web site on December 5, 2006, the date that appeared on the printout.

The court ruled that it would admit a single, redacted page from the MySpace printout, containing only the photo next to a description of the page creator as a 23 year-old female from Fort Deposit, and a portion of the blurb, stating: "FREE

BOOZY!!!! JUST REMEMBER SNITCHES GET STITCHES!! U KNOW WHO YOU ARE!!"

Without waiving appellant's objection, defense counsel agreed to the following stipulation, in lieu of Cook's testimony:

> If asked, Sergeant Cook would testify that he went onto the internet to the web site known as MySpace.... [F]rom that site he downloaded some information of a posting that someone had put there.
>
> That posting contains a photograph which the witness would say he recognizes as a photograph of Jessica ... Barber, who testified, ... that she is the defendant's live-in fiancé; and that it also contains a date of birth, to wit October 2nd, 1983, which the witness would testify is the date of birth that Jessica Barber gave as her date of birth.
>
> When this exhibit, the download, comes to you, you are going to see that it has a great—that most of its content has been redacted; this is, blacked out. That's because some of it, in my judgment, might tend to be inflammatory without proving anything one way or the other. There is one portion of it that will not be redacted when it comes to you, and this is the only portion of it which you should consider. And you certainly should not speculate as to what any of the redacted portions may be.
>
> The portion that will not be redacted says, just remember snitches get stitches. You will see that. The phrase is, just remember snitches get stitches.... And ... the witness would testify that the date it was retrieved was.... December 5, 2006.

Thereafter, the court promptly instructed the jury regarding the limited evidentiary purpose of the MySpace printout, as follows:

> Now here's a cautionary instruction. This is being offered for a limited purpose. The limited purpose is for such weight as you choose to give it. That's completely up to you. You will hear me say several times when I [instruct] you that I'm going to be instructing you as to the law on

various things. It's for you to decide what the evidence shows.

And by my instructions and my cautionary instruction now you should not assume that I am implying one thing or another as to how much weight or what the evidence shows. That's completely up to you.

But it's being offered for the proposition that this corroborates what Dennis Gibbs said about being threatened by the defendant's girlfriend. Now you can decide whether it corroborates that or not. You can decide what that means in the context of Mr. Gibbs' testimony. That's completely up to you. I'm not implying anything in that regard.

But that's the limited purpose for which this evidence is being offered. It should be considered on nothing but that purpose. Now you may decide that it corroborates Mr. Gibbs. You may decide it does not corroborate Mr. Gibbs. If you find that it corroborates Mr. Gibbs, then you still have to evaluate the rest of Mr. Gibbs' testimony. That's completely up to you.

But that's the only purpose it [sic] going offered for, because Gibbs said that he was threatened by the defendant's girlfriend; and the [S]tate is offering this for the sole purpose of showing that on this web site as of December 5, 2006, a statement is made, just remember snitches get stitches.

The defense did not present any testimonial evidence. But, it introduced various documents.

During the court's instructions to the jury, the judge reviewed the stipulations. He stated, in part: "And that Sergeant Cook went online to the Web site My Space and downloaded an entry there, redacted version of which is in evidence, and that he would have testified that there was a photo there of Miss Barber."

In closing argument, the State relied upon the MySpace page to explain the inconsistencies in Gibbs's testimony. After referring to Gibbs's claim that Ms. Barber threatened him before the first trial, the prosecutor said:

Mr. Gibbs said, That's the reason that my testimony at that trial wasn't consistent with my testimony at this trial. Now, is that believable, that statement from him? I suggest to you it is. . . . Sergeant Cook told you that he went online and went to a website called My Space and found a posting that had been placed there by the defendant's girlfriend, Jessica Barber, recognized her picture, able to match up the date of birth on the posting with her date of birth, and the posting includes these words, "Free Boozie. Just remember, snitches get stitches. You know who you are."

In closing argument, the defense argued, in part:

And I suggest to you, ladies and gentlemen, that [Gibbs] said in court last time under oath, and he told you, that he never even saw Antoine Griffin go into the bathroom. He was standing by the bar when the shots were fired. That's what he told another court under oath. He told you this time that George Griffin did not go into the bathroom. He told the police and someone else that George Griffin did go into the bathroom. And he tells you that his inconsistencies and his lying under oath either today or back in August of '06 was because he was fearful.

In rebuttal, the State responded:

Now, were there inconsistencies between Mr. Gibbs' testimony at the August 2006 trial and this trial? Absolutely. Absolutely. I don't in any way pretend there weren't, and I talked to you a while ago about why that was. . . . Well, first, folks, remember . . . the stipulation that we had regarding Sergeant Cook's testimony about that page that it was only December of '06 that Sergeant Cook found the page. There's no evidence whatsoever of when the page was created. Could have been before August 2006. Maybe it wasn't. But even if it wasn't, folks, it's not the date of creation of the page or the date of finding of the page by Sergeant Cook that's important. What's important is the state of mind evidenced by the person to whom the page relates, and that person was Jessica Barber, the defendant's girlfriend, and the state of my [sic] evidence by that page is

 

snitches get stitches. Just what Gibbs told you in regard to his explanation of why his testimony at the August 2006 trial was not consistent with his testimony at this trial.

## B.

As noted, appellant contends that the trial court erred in admitting the redacted printout from the MySpace page. He asserts: "The State came nowhere near authenticating the contents of the MySpace page as statements by Barber."

Claiming that it provided adequate authentication under Md. Rule 5–901(b)(4), the State posits: "The foundational evidence the State provided was sufficient to support a reasonable inference by the jury that the printout was what it purported to be—Jessica Barber's MySpace website." Moreover, it contends that the only issue pertains to whether the MySpace page belonged to Barber, because the defense "stipulated to the process by which [the State] obtained the information from the website."

As to the adequacy of the prosecution's authentication, the State points to the content of the profile, which included Ms. Barber's photograph, her date of birth, and the references to her children. Further, it asserts:

> Three other considerations support the trial court's determination that the State had offered sufficient authentication evidence. In her testimony, Barber confirmed that Griffin sometimes went by the nickname "Boozy," the name used on the MySpace page. Additionally, Sergeant Cook's testimony should be deemed sufficient given that a MySpace website is a personal profile containing text and image content supplied not by MySpace itself, but rather by the site's individual users. The judge, moreover, provided a detailed limiting instruction clarifying the purpose for which the statement could be used and emphasized that the MySpace page should be afforded only "such weight as [the jurors] choose to give it."

Maryland Rule 5–901 governs authentication. Notably, the authentication concerns attendant to the use of evidence print-

**532**

ed from a social networking Web site such as MySpace is a topic on which there is no Maryland precedent and scant case law from other jurisdictions.

Under Rule 5–901(a), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Moreover, Md. Rule 5–901(b)(4) provides, "[b]y way of illustration," that "[c]ircumstantial evidence, such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics," may be sufficient to establish "that the offered evidence is what it is claimed to be." *See, e.g., Knoedler v. State,* 69 Md.App. 764, 772–74, 519 A.2d 811 (1987) (holding that telephone conversations were admissible where direct or circumstantial evidence was presented " 'to establish the identity of the other person to the conversation,' " and noting that "[s]uch authentication can be found either from evidence that the witness was familiar with and recognized the voice of the alleged caller, or, in the absence of such recognition, 'sundry circumstances....' ") (citations omitted).

 Whether there is sufficient authenticating evidence to admit a proffered document is a preliminary question to be decided by the court. *See* Md. Rule 5–104(a). The court must make its threshold determination of whether there is sufficient authenticating evidence on the basis of admissible evidence that the jury may later consider in making its ultimate determination of authenticity. *See Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534, 539–40 (D.Md.2007) (construing and applying analogous federal rules in determining admissibility of electronic communications). However, "the burden of proof for authentication is slight, and the court 'need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the *jury* ultimately might do so.' " *Dickens v. State,* 175 Md.App. 231, 239, 927 A.2d 32 (2007) (quoting *United States v. Safavian,* 435 F.Supp.2d 36, 38 (D.D.C.2006)) (emphasis in *Safavian* ). When a proponent makes a prima facie showing that a prof-

fered document is genuine, the " 'writing or statement comes in, and the ultimate question of authenticity is left to the jury.' " *Gerald v. State,* 137 Md.App. 295, 304, 768 A.2d 140 (citation omitted), *cert. denied,* 364 Md. 462, 773 A.2d 514 (2001). We review a decision to admit such evidence for abuse of discretion. *Id.* at 305, 768 A.2d 140.

As indicated, this case involves a profile posted on a social media networking site, MySpace. Such Web sites, which include Facebook, LinkedIn, Plaxo, and Twitter, are increasingly popular vehicles for the dissemination of personal information posted on individualized profiles. Social media Web sites offer users multi-faceted avenues to "network" with fellow users, along with control over the content of their profiles.[4] The Court of Appeals explained in *Independent Newspapers, Inc. v. Brodie,* 407 Md. 415, 424 n. 3, 966 A.2d 432 (2009): "Social networking sites and blogs are sophisticated tools of communication where the user voluntarily provides information that the user wants to share with others.... The user can choose what information to provide...." Moreover, the *Brodie* Court recognized that these Web sites offer users the opportunity to post messages for the world to see, as well as the option "to tightly control the dissemination of [posted] information." *Id.*[5]

---

**4.** In a recent article by information technology engineers, the authors stated:

> In April 2009, Facebook announced that it had over 200 million active users worldwide. In the same month, Twitter, the new kid on the social networking block, reached over 14 million users in the United States. LinkedIn claims over 48 million members worldwide and Plaxo over 40 million. MySpace, once the 800–pound gorilla of this new world, has fallen from favor with Internet users. Still, according to TechCrunch, it has an impressive 125 million users globally. These networks are rapidly becoming a part of everyday life to an increasing number of people, but if any of the sites listed above are unfamiliar to you, just take a look at their Wikipedia entries.

Sharon Nelson et al., *The Legal Implications of Social Networking,* 22 REGENT U.L. REV. 1, 1–2 (2009/2010) (footnotes omitted).

**5.** For an informative description of various forms of Internet communication, including e-mails, instant messaging, blogs, chatrooms, and discussion forums, *see Brodie,* 407 Md. at 422–25, 966 A.2d 432. In

Typically free to users, social networking sites "can serve as an online newsletter or as a personal journal—where an individual can post concerns, ideas, opinions, etc.—and it can contain links to web sites or can use images or video." *Id.* at 424, 966 A.2d 432. But, in the absence of limitations imposed by the user, "whatever is posted [is] available to the world at large." *Id.* at 424 n. 3, 966 A.2d 432. Moreover, the development of Web sites like YouTube allows users to upload streaming video, so that personal statements may be recorded and disseminated. Thus, such online networking communities have led to an expanding universe of shared information, and have been aptly characterized as "soda fountains for the twenty-first century." *See, e.g.,* John S. Wilson, *MySpace, Your Space, or Our Space? New Frontiers in Electronic Evidence,* 86 OR. L.REV. 1201, 1219–24 (2007) (reviewing the history of social networking sites).

With respect to MySpace, the particular social media Web site at issue here, one court has explained, using MySpace's own words:

MySpace is "an online community that lets you meet your friends' friends." Most aptly described as a social networking site, individuals can create "profiles" listing their interests in books, television, music, movies, and so forth, as well as posting pictures, music, and videos. MySpace allows its members to control who can view the entirety of their "profile." On all "profiles," certain information is displayed to other members and visitors that "allows our users to identify each other and expand their network of friends." MySpace users have a choice to make their "profiles" public or private. For example, if a member wishes to restrict public access to her "profile," she may make it viewable to only those that she has accepted as friends, but information

*Brodie,* the Court said, 407 Md. at 423, 966 A.2d 432: "Blogs, chatrooms and discussion forums constitute a different category of Internet communications, in which users often post statements to the world at large without specification."

such as the member's photo and first name are still displayed for public view.

*A.B. v. State*, 885 N.E.2d 1223, 1224 (Ind.2008) (footnotes and citations omitted).

The design and purpose of social media sites make them especially fertile ground for "statements involving observations of events surrounding us, statements regarding how we feel, our plans and motives, and our feelings (emotional and physical)[.]" *Lorraine*, 241 F.R.D. at 569. For that reason, both prosecutors and criminal defense attorneys are increasingly looking for potential evidence on the expanding array of Internet blogs, message boards, and chat rooms. *See, e.g.,* Nelson, *supra*, at 13 ("It should now be a matter of professional competence for attorneys to take the time to investigate social networking sites."); Seth P. Berman et al., *Web 2.0: What's Evidence Between "Friends"?*, 53 B.B.J. 5, 6 (Jan/Feb 2009) (social networking sites "may record people's thought processes and impressions in unguarded moments, exactly the sort of evidence that can be invaluable during litigation"); Kathrine Minotti, *Evidence: The Advent of Digital Diaries: Implications of Social Networking Web Sites for the Legal Profession*, 60 S.C. L. REV. 1057, 1059–61, 1066–68, 1071–73 (2009) ("Prosecutors are gathering information from social networking web sites for evidence. . . .").

As indicated, users of social media Web sites, blogs, chat rooms, and discussion forums may post messages anonymously or under pseudonyms. *See* Wilson, *supra*, at 1220. The Court observed in *Brodie*, 407 Md. at 425, 966 A.2d 432: "Since the early 1990's, when Internet communications became available to the American public, anonymity or pseudonymity has been a part of the Internet culture."

The MySpace profile at issue here illustrates that a user "can choose not to provide" the user's real name. *See id.* at 424 n. 3, 966 A.2d 432. Instead, users may join the online community anonymously, by registering under password and

user names that are self-selected and confidential.[6] Access to the profile may be obtained by logging in on the Web site with the confidential user name and password. Other social networking site features preserve the veil of anonymity or pseudonymity, by allowing members to communicate electronically using their chosen screen names, both via private message sent to other members, as an alternative to traditional e-mail in which "users generally know with whom they are communicating[,]" *id.* at 422, 966 A.2d 432, and via an "in-house" instant messaging option that allows members to conduct real-time "chats" with other members, by use of their screen names. *See* Wilson, *supra*, at 1220.

In *Brodie*, 407 Md. at 419, 966 A.2d 432, the Court held that a company that commissioned an Internet forum allowing participants to post messages under screen names could not be required to identify those participants in the circumstances of that case. In doing so, the Court recognized the increasing difficulty in ascertaining the identity of a person posting a message on an Internet site under a screen name. *Id.* at 424–25, 966 A.2d 432. Recounting the development of anonymous communications on the Internet, the Court said, *id.* at 425–27, 966 A.2d 432:

> Generally, first exposure to communications on the Internet was through the use of a dial-up online access providers, such as America Online ("AOL") or Prodigy. These online access providers permitted subscribers to choose "screen names" to represent their online identities. When users logged-on using their screen names, they reached a home page presenting them with a host of communications services—from e-mail to chatrooms to instant messaging to forums—all of which were provided by the online access provider and all of which were accessed by using the online access provider's screen name. Thus, for example, under the AOL regime, an account held by John Smith might have had the screen name/log-in of "Jsmith1417," the e-mail

---

**6.** The name that is publicly displayed on the profile is known as a screen name.

address of "Jsmith1417@aol.com," and any statement posted in a chatroom, during an instant message exchange or in a forum, would be posted under the screen name "Jsmith1417." Under this configuration, subscribers enjoyed a degree of anonymity, because they were permitted to use a screen name wholly distinct from their real name, but their screen names also were easily traceable, because they were linked to an Internet access account.

Full-service online access providers, like AOL or Prodigy, presently no longer dominate the Internet communications market, and at-home access to the Internet is often achieved through broadband services, provided by local cable or phone companies. These broadband companies, unlike former online access providers, usually do not require the registration of a screen name and generally provide Internet access without any other services. Most communications services, moreover, such as those that provide e-mail, instant messaging, chatrooms or forums, are accomplished through a website hosted by a third-party on the World Wide Web. Thus, today, the hypothetical Internet user John Smith might gain access to the Internet through his local cable company, might obtain the e-mail address JSmith1747 over the World Wide Web through Google's "gmail," or a like service, and might participate in an Internet forum regarding a topic of interest under the registered username "crazyCOAcommentator." When registering for this forum, John Smith might even obfuscate his true identity, making it even more difficult to trace his statements to him. In short, **unlike former days when a user's posts were easily traceable through the online access provider's billing records, today, the World Wide Web host of an e-mail, instant messaging, forum or chatroom service obtains only as much information about an individual as it requires for registration,** and even then, there are few checks to ensure the validity and accuracy of that information. (Emphasis added; footnotes omitted.)

The anonymity features of social networking sites may present an obstacle to litigants seeking to authenticate mes-

sages posted on them. *See, e.g.,* Paul W. Grimm et al., *Back to the Future: Lorraine v. Markel American Insurance Co. and New Findings on the Admissibility of Electronically Stored Information,* 42 AKRON L.REV. 357, 370–71 (2009) ("Chat room and text or instant messaging 'dialogues' ... pose unique challenges to authentication due in large part to the fact that they typically are created by parties using anonymity-protecting 'screen names' on websites where the host cannot be assumed to know the content."). That is the issue we encounter here: whether the State adequately established the author of the cyber message in question.

Despite the pervasive popularity of social networking sites and their potential as treasure troves of valuable evidence, Maryland appellate courts have not yet addressed the issue of authenticating anonymous or pseudonymous documents printed from social media Web sites. Notably, neither the Maryland Rules of Evidence nor the Maryland Rules of Procedure specifically address the authentication of such evidence. Perhaps this is because courts that have generally considered the issue of authentication of electronic communications have concluded that they may be authenticated under existing evidentiary rules governing authentication by circumstantial evidence.

In the leading case of *Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534 (D.Md.2007), Magistrate Judge Paul Grimm, a noted authority on electronic discovery, offered well-reasoned methods to authenticate various types of electronically stored information, including e-mails, text messages, chat room logs, and "Internet Website Postings." Although *Lorraine* recognized that such evidence "may require greater scrutiny than that required for the authentication of 'hard copy' documents,[] " the court suggested that the existing rules governing authentication provide an adequate analytical framework to determine the admissibility of such evidence. *Id.* at 542–43.

In particular, the *Lorraine* Court cited Federal Rule of Evidence 901(b)(4), the federal analogue to Md. Rule 5–901(b)(4), as "one of the most frequently used to authenticate

e-mail and other electronic records." *Id.* at 546. It observed: " '[T]he characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety,' including authenticating an exhibit by showing that it came from a 'particular person by virtue of its disclosing knowledge of facts known peculiarly to him[.]' " *Id.* (quoting FED.R.EVID. 901(b)(4) advisory committee's note). *See generally* Steven Goode, *The Admissibility of Electronic Evidence*, 29 REV. LITIG. 1, 7 (2009) (explaining why "the existing rules of evidence are adequate to the task of addressing questions about the admissibility of such electronic evidence").

*Dickens,* 175 Md.App. at 241, 927 A.2d 32, is also noteworthy. There, we upheld a decision to admit into evidence electronically communicated text messages proffered for the purpose of showing that the sender threatened his estranged wife over a period of time before he murdered her. Applying Rule 5–901(b)(4), we held, *inter alia,* that messages sent to the victim's cell phone, one without a return phone number and two sent by a person identified only as "Doll/M," were sufficiently authenticated as having been sent by the defendant. *Id.* at 239–40, 927 A.2d 32. In reaching that conclusion, we relied on circumstantial evidence that two of the messages were sent during a period of time consistent with the time line of criminal events, and that the substantive content of all three messages pointed to the defendant's authorship. *Id.* Of import here, we pointed to references in the individual text messages to the defendant, his wife, their son, and their wedding vows, which indicated that they were sent by the defendant. *Id.*

The rationale of *Dickens* supports our view that Maryland Rule 5–901(b)(4), like its federal counterpart, permits authentication of electronic communications based on the content and the circumstances of those messages. Although we did not explicitly say as much, *Dickens* also suggests that circumstantial evidence may be sufficient to establish authorship of an electronic message without the use of technological

data. *See also State v. Thompson,* 777 N.W.2d 617, 623 (N.D.2010) (holding that evidence that recipient of threatening text messages was familiar with the defendant's phone number and distinctive electronic signature was sufficient to authenticate messages as having been sent by the defendant); *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F.Supp.2d 1146 (C.D.Cal.2002) (considering content of e-mails printed from a corporate Web site and attached to authenticating affidavit in granting a preliminary injunction).

We have found only a handful of reported cases involving evidence specifically pertaining to social networking Web sites. *See, e.g., A.B., supra,* 885 N.E.2d 1223 (holding that a juvenile's profane messages criticizing disciplinary actions taken by her former school principal, which she posted on her MySpace profile and on a MySpace group page, were protected political speech); *In re K. W.,* 192 N.C.App. 646, 666 S.E.2d 490, 494 (2008) (concluding that victim's statements on her MySpace profile were admissible as prior inconsistent statements to impeach her testimony, but that exclusion was harmless error); *In re T.T.,* 228 S.W.3d 312, 322–23 (Tex.Ct.App. 2007) (involving a termination of parental rights proceeding, in which the court considered a father's statement on his MySpace profile that he did not want children). Our research reveals only one reported decision directly resolving an authentication challenge to evidence printed from a social media Web site. However, it involved a printout of MySpace instant messages rather than a MySpace profile page, and was authored by a trial court; we have not found a reported appellate decision addressing the authentication of a printout from a MySpace or Facebook profile.

In *Ohio v. Bell,* 145 Ohio Misc.2d 55, 882 N.E.2d 502, 511 (C.P.2008), *aff'd,* No. CA2008–05–044, 2009-Ohio-2335, 2009 WL 1395857, 2009 Ohio App. Lexis 2112 (Ohio Ct.App. May 18, 2009), the trial court denied a defense motion to exclude printouts of MySpace instant messages alleged to have been sent to a victim by the defendant under his MySpace screen name. It pointed to the dearth of authority on the "important issue" of authenticating printouts of electronic communica-

tions. Moreover, it was not persuaded by the defense complaints "that MySpace chats can be readily edited after the fact from a user's homepage" and that, "while his name may appear on e-mails to T.W., the possibility that someone else used his account to send the messages cannot be foreclosed." *See id.* at 511–12. The trial court emphasized that the evidence required to meet the authentication threshold for admissibility "is quite low—even lower than the preponderance of the evidence," and observed that "[o]ther jurisdictions characterize documentary evidence as properly authenticated if 'a reasonable juror could find in favor of authenticity.' " *Id.* at 512 (citing *United States v. Tin Yat Chin,* 371 F.3d 31, 38 (2d Cir.2004)).

After reviewing the evidentiary proffers, the court concluded that the MySpace chat logs could be authenticated "through [the alleged victim's] testimony that (1) he has knowledge of defendant's ... MySpace user name, (2) the printouts appear to be accurate records of his electronic conversations with defendant, and (3) the communications contain code words known only to defendant and his alleged victims." *Id.* Moreover, the court held that "evidence of electronic conversations between defendant and the alleged victims would be relevant under Evid.R. 40" and that, "[u]pon testimonial development of the 'code language' at issue, the probative value of these messages would outweigh any prejudicial effect." *Id.*

*Bell* is consistent with other decisions affirming the admission of transcripts of chat room conversations on the basis of similar authenticating testimony by the other party to the online conversation. *See, e.g., United States v. Barlow,* 568 F.3d 215, 220 (5th Cir.2009) (Internet chat logs of correspondence between defendant and police contractor posing as minor were adequately authenticated through contractor's testimony); *United States v. Gagliardi,* 506 F.3d 140, 151 (2d Cir.2007) (concluding that chat room logs were authenticated as having been sent by defendant through testimony of persons who participated in the online conversations); *United States v. Tank,* 200 F.3d 627, 630–31 (9th Cir.2000) (concluding

that content of conversation was sufficient to link defendant to user name on chat room log printouts); *State v. Glass*, 146 Idaho 77, 190 P.3d 896, 901 (Ct.App.2008) (finding that chat room statements were adequately linked to the defendant by evidence that he arrived for a meeting as arranged in that private correspondence), *rev. denied*, No. 31422, 2008 Ida.App. Lexis 117 (Idaho August 11, 2008); *In re F.P.*, 2005 PA Super 220, 878 A.2d 91, 95–96 (2005) (holding that evidence regarding content and timing of threatening instant messages was sufficient to authenticate them, and rejecting the argument that anonymity of electronic messages makes them inherently unreliable).

To be sure, profile information posted on social networking Web pages differs from chat logs of instant message correspondence conducted through such sites. A chat log is a verbatim transcript of a private "real time" online conversation between site members, which can be authenticated by either of the two participants. In contrast, social networking profiles contain information posted by someone with the correct user name and password, with the intent that it be viewed by others. Therefore, a proponent should anticipate the concern that someone other than the alleged author may have accessed the account and posted the message in question. *Cf., e.g., In re K.W.*, 192 N.C.App. 646, 666 S.E.2d 490, 494 (2008) (although victim admitted that the proffered MySpace page was hers, she claimed that her friend posted the answers to the survey questions that defendant sought to introduce as impeachment evidence with respect to her claims of rape). *See also St. Clair v. Johnny's Oyster & Shrimp, Inc.*, 76 F.Supp.2d 773, 774–75 (S.D.Tex.1999) ("There is no way Plaintiff can overcome the presumption that the information he discovered on the Internet is inherently untrustworthy. Anyone can put anything on the Internet ... hackers can adulterate the content on *any* website....").

A pseudonymous social networking profile might be authenticated by the profiled person, based on an admission. That did not occur here, however, because the State never questioned Ms. Barber about the profile. Nevertheless, we regard

decisions as to authentication of evidence from chat rooms, instant messages, text messages, and other electronic communications from a user identified only by a screen name as instructive to the extent that they address the matter of authentication of pseudonymous electronic messages based on content and context. We see no reason why social media profiles may not be circumstantially authenticated in the same manner as other forms of electronic communication—by their content and context. *Accord* Minotti, *supra*, at 1061–62 ("cases that did not address social networking web sites specifically but addressed Internet communication devices similar to social networking web sites, such as instant messaging and email,[] are helpful because of the argument presented for the denial of admissibility . . . such as . . . problems with authentication").

The inherent nature of social networking Web sites encourages members who choose to use pseudonyms to identify themselves by posting profile pictures or descriptions of their physical appearances, personal background information, and lifestyles. This type of individualization may lend itself to authentication of a particular profile page as having been created by the person depicted in it. That is precisely what occurred here.

The MySpace profile printout featured a photograph of Ms. Barber and appellant in an embrace. It also contained the user's birth date and identified her boyfriend as "Boozy." Ms. Barber testified and identified appellant as her boyfriend, with the nickname of "Boozy." When defense counsel challenged the State to authenticate the MySpace profile as belonging to Ms. Barber, the State proffered Sergeant Cook as an authenticating witness. He testified that he believed the profile belonged to Ms. Barber, based on the photograph of her with appellant; Ms. Barber's given birth date, which matched the date listed on the profile; and the references in the profile to "Boozy," the nickname that Ms. Barber ascribed to appellant.[7]

---

7. The defense never recalled Ms. Barber to dispute the accuracy of Cook's testimony.

Appellant relies on two out-of-state cases to suggest that printouts from such social networking sites must be authenticated either by the author or expert information technology evidence, neither of which occurred here. We are not persuaded. The unpublished Florida decision cited by appellant lacks persuasive value. The other case, *In re Homestore.com, Inc. Securities Litigation,* 347 F.Supp.2d 769 (C.D.Cal.2004), involved a ruling that printouts from a corporate Web site were properly excluded in securities litigation because there was no authenticating evidence from the company's "web master or someone else with personal knowledge...." *Id.* at 782. In our view, the case is not instructive because appellant never argued below that the printout did not accurately depict the MySpace profile in question. Moreover, printouts from a company-created and controlled Web site differ materially from printouts from a social networking profile, in that site members create and control their own individual profiles.

On the record before us, we have no trouble concluding that the evidence was sufficient to authenticate the MySpace profile printout. Therefore, the trial court did not err or abuse its discretion in admitting that document into evidence.

## C.

 Alternatively, appellant argues that the MySpace profile printout should have been excluded "because its prejudice to appellant far outweighed its probative value." In his view, the probative value of the evidence was "minimal," given that the only change in Gibbs's testimony pertained to whether he saw appellant enter the bathroom after Mr. Guest. On the other hand, appellant maintains that the jury "undoubtedly" was influenced by the statement as "evidence of witness intimidation," making it possible that "the jury ... decided to find him guilty, at least partly, for the purpose of sending a message regarding witness intimidation." Moreover, he contends that admission of the evidence could not have been harmless error because, without it, "it is highly likely that the jury would have had a reasonable doubt regarding appellant's

guilt based on the evidence surrounding Gibbs's involvement alone."

Preliminarily, the State contends that appellant has not preserved his claim that the probative value of the evidence was outweighed by the prejudice. It points out that at trial Griffin "argued only that Gibbs' testimony was fundamentally consistent, making the admission of the MySpace page unwarranted. Griffin, however, made no other argument at trial regarding either the MySpace page's relevance or its risk of introducing unfair prejudice, leaving all other arguments regarding its admissibility unpreserved."

Even if preserved, the State maintains that appellant's claim is without merit. In its view, because the defense challenged Gibbs's credibility, the MySpace page had "significant probative value in corroborating Gibbs' claim of threats," and the probative value was not "outweighed by any danger of unfair prejudice."

The State argues:

To the extent that this Court addresses the merits of Griffin's claim, the trial court acted within its broad discretion in admitting a redacted printout of the MySpace page, which corroborated Gibbs's explanation that changes in his testimony followed threats from Griffin's girlfriend. Because Gibbs testified at the second trial to a crucial fact contrary to his previous testimony—namely, that he did see Antoine Griffin enter the women's restroom, where the shooting occurred—the trial court properly exercised its discretion in admitting the printout.

Assuming that the claim is preserved, we conclude that the trial court did not err or abuse its discretion in failing to exclude the "SNITCHES GET STITCHES" statement on Ms. Barber's MySpace profile on the basis of undue prejudice. We explain.

Under Maryland Rule 5–403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury[.]" The task of balancing the probative value of a particular item of evidence against its potential prejudicial effect "is committed to the sound discretion of the trial judge." *State v. Broberg,* 342 Md. 544, 552, 677 A.2d 602 (1996).

Gibbs's credibility was a hotly contested issue at trial. The defense underscored that Gibbs's testimony at the first trial was inconsistent with his testimony at the second trial as to whether he saw appellant or George Griffin enter the bathroom following Mr. Guest. Although the prosecution acknowledged the inconsistencies, it offered Gibbs's explanation that Ms. Barber had threatened him before the first trial.

Even if appellant had explicitly asked for exclusion under Rule 5–403, the record indicates that the trial court reasonably exercised its discretion in deciding to permit the State to present such evidence, for whatever value the jury might give it, in support of its effort to explain the inconsistencies in Mr. Gibbs's testimony. It is also salient that the trial court carefully redacted irrelevant material from the profile and gave a detailed limiting instruction to the jurors, telling them that it was up to them to weigh such evidence. We cannot say that exclusion on the ground of undue prejudice was required under these circumstances.

## D.

In his next assignment of error, appellant argues that "the trial court erred in allowing the prosecutor to incorrectly define 'reasonable doubt' in his rebuttal closing argument" and to otherwise suggest "that the defense had the burden to prove that one of the other people present at the bar did commit the shooting[.]" In his view, the colloquy "almost certainly left confusion in the juror's mind regarding which party had which burden and, most importantly, about what reasonable doubt means":

The following occurred at trial:

[PROSECUTOR]: [Defense counsel] says, Hey, remember what beyond a reasonable doubt means. Remember that it

doesn't mean probably or more likely. I agree. I agree. But it means this, do you right now have a good reason to believe that somebody other than [appellant] was the person who shot Darvell Guest in Ferrari's Bar on April 25th, 2005? I'm not asking you whether you can speculate and create some construct of hypothetical possibilities that would have somebody else than he be the shooter. I'm not asking you that question at all. I'm asking you the question, do you have right now any reason, any rational reason to believe that somebody other than he was the shooter or gunman?

[DEFENSE COUNSEL]: I would object.

THE COURT: I think that's the definition of reasonable doubt.

[DEFENSE COUNSEL]: But we don't have to prove that. He said the same thing as somebody else.

The Court: Well, I agree. The defense has no burden to prove anything. I understand the State's argument at this point to be, do you have a reasonable doubt, do you had a doubt based on reason?

[PROSECUTOR]: That's correct.

THE COURT: That's why he used the word "reason."

[PROSECUTOR]: And, folks, I recognize that it's my job as the prosecutor to prove these charges to you beyond a reasonable doubt, that is to say to the exclusion of reasonable doubt. I simply suggest to you, folks, that reasonable doubt doesn't exist in this case because there's just no reason based on this evidence to believe that anybody other than [appellant] fired the shots that killed Darvell Guest and, once again, I ask you to find him guilty.

 It is well settled that counsel generally enjoy the rhetorical freedom in closing argument to discuss the evidence in the light most favorable to his or her theory of the case. *See Mitchell v. State*, 408 Md. 368, 380, 969 A.2d 989 (2009). Appellate relief is warranted, *inter alia*, when the prosecutor's remarks "actually misled or were likely to have misled the jury to the defendant's prejudice." *Wise v. State*, 132 Md. App. 127, 142, 751 A.2d 24, *cert. denied*, 360 Md. 276, 757 A.2d

811 (2000). *See also Lee v. State,* 405 Md. 148, 164, 950 A.2d 125 (2008). This is not one of those instances.

We concur with the State that the prosecutor did not misstate the reasonable doubt standard, but merely discussed that standard as it applied to the evidence presented at trial. It was undisputed that someone in Ferrari's Bar shot and killed Mr. Guest, so the jury had only three alternative conclusions it could reach. It could find (1) that appellant was the killer, as the State urged; or (2) that someone else was the killer, as the defense suggested; or (3) that there was a reasonable doubt, based on conflicts in the eyewitness accounts of prosecution witnesses, as to whether appellant was the killer, as the defense also advocated. The challenged rebuttal argument by the prosecutor merely urged the jury to reach the first conclusion and to reject the two defense alternatives.

Furthermore, even if there had been error, it was harmless, beyond a reasonable doubt. *See Alston v. State,* 414 Md. 92, 107–08, 994 A.2d 896, 905 (2010); *Lancaster v. State,* 410 Md. 352, 369, 978 A.2d 717 (2009); *State v. Blackwell,* 408 Md. 677, 698, 971 A.2d 296 (2009); *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976). Prior to closing arguments, the trial court correctly instructed the jury on the meaning of reasonable doubt, using the pattern jury instruction. When defense counsel objected that appellant was not obligated to prove that someone else was the killer, both the trial court and the prosecutor agreed, and the court stated: "The defense has no burden to prove anything." The prosecutor then continued his rebuttal argument by clarifying that "it's my job as the prosecutor to prove these charges to you beyond a reasonable doubt."

Given the clear and repeated statements that the State had the burden of proving that appellant killed Mr. Guest—made by the court, the prosecutor, and defense counsel—we are readily satisfied that the jury was not misled into believing that appellant had to prove that someone else in the bar killed Mr. Guest.

**E.**

■ Appellant's final complaint is that "the trial court erred in failing to declare a mistrial following an outburst by the mother of one of the victims." Again, we disagree.

The outburst occurred during the testimony of Kesha Bowser, who was Guest's fiancée at the time of his death. On direct examination, Ms. Bowser testified about the events at Ferrari's. She recalled: "[Appellant] pulled out a gun in my face...." On cross-examination, defense counsel asked Ms. Bowser about her testimonial inconsistencies at the first and second trials. She explained that she had been "nervous," "upset," and "crying" during the first trial. The following transpired:

[DEFENSE COUNSEL]: So you're not nervous or upset today?

[MS. BOWSER]: I'm actually a little calmer because I'm more prepared from last time.

[DEFENSE COUNSEL]: And meaning by prepared, so you spoke with the State's attorney.

UNIDENTIFIED WOMAN: Today.

[MS. BOWSER]: Today, yeah.

UNIDENTIFIED WOMAN: He put the gun in my daughter's face and you want to make it seem like—(unintelligible).

THE COURT: Whoa, whoa. Ma'am, I caution you to remain quiet while you leave the courtroom.

(Pause in the proceedings.)

THE COURT: Now, ladies and gentlemen, let me calmly say that I appreciate the fact that this case and the testimony in this case has emotional content for both sides in the matter. But this is a courtroom and one of my major responsibilities here is to maintain order so that both sides can be heard in an orderly and fair fashion.

Now, I understand that I'm preaching to the choir, so to speak, because everybody I'm speaking to has not had an outburst, so please don't take any offense from this, but

please understand from what you've just seen that I will tolerate no outburst whatsoever. I will have a person who does such a thing removed from the courtroom. And if necessary, I will use the contempt power of the Court, reluctantly, but I will do it if I have to.

In the ensuing bench conference, defense counsel moved for a mistrial, asserting that appellant could no longer get a fair trial. The prosecutor opposed the motion, asking instead for a "cautionary instruction." The court denied the motion and gave the following instruction to the jury:

All right. Ladies and gentlemen, everything that happens in the presence of a jury is seen and heard by the jury. And all of us as adults and as we become more mature as adults have to learn how to sort through what we're going to pay attention to and what we are not going to pay attention to. None of us can purge our hard drives, so to speak, so that what you've seen or heard is not there. But I want to caution you that what you saw and what you heard— frankly, I was preoccupied with getting security moving to stop the outburst, so you heard better than I did whatever was said.

I'm told that the lady who had the outburst is the mother of this witness and is apparently emotionally upset, and all of us as parents feel protective toward our children. Whatever she said is not evidence in this case and you should pay no attention to it whatsoever.

As you may have heard me say numerous times, you have to decide the case based on the evidence that you have. And evidence does not come from outside the courtroom, and in fact, doesn't come from emotional outbursts inside the courtroom. So please disregard whatever the lady said. It was an emotional outburst. I stopped it and it is not evidence in this matter. You should not let it affect you one way or the other.

Now, we are at a little past the time to take an afternoon break anyway and this may be a good time to take an afternoon break. Let everybody calm down, take a deep

breath, and then we'll come back and finish the testimony of this witness at about ten minutes of.

A mistrial is a rare remedy that " 'should only be granted if necessary to serve the ends of justice.' " *Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218 (1990) (citation omitted), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). The trial court is in the best position, having heard the case, to weigh the danger of prejudice arising from improper testimony. *Burks v. State,* 96 Md.App. 173, 190, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993). For that reason, we review the denial of a request for a mistrial for abuse of discretion. *See State v. Hawkins,* 326 Md. 270, 277, 604 A.2d 489 (1992). Such abuse exists when "the prejudice to the defendant was so substantial that he was deprived of a fair trial." *Kosmas v. State,* 316 Md. 587, 595, 560 A.2d 1137 (1989).

Deference to the trial court's ability to evaluate prejudicial effect is especially appropriate in cases involving emotional displays or outbursts by members of a victim's family. "A motion for a mistrial, based on the behavior in the courtroom of a member of the victim's family, should only be granted under very extraordinary circumstances[.]" *Parham v. State,* 79 Md.App. 152, 158, 556 A.2d 280 (1989).

In an appeal involving members of a slain police officer's family leaving the courtroom in emotional distress during the playing of a police recording of the shooting, the Court of Appeals observed that "[e]motional responses in a courtroom are not unusual, especially in criminal trials, and manifestly the defendant is not entitled to a mistrial every time someone becomes upset in the course of the trial." *Hunt v. State,* 312 Md. 494, 501, 540 A.2d 1125 (1988). And, in another case involving an isolated emotional outburst against the defendant by the mother of a victim, we held that a curative instruction adequately preserved the defendant's right to a fair trial. *See Parham,* 79 Md.App. at 158, 556 A.2d 280.

Nothing in the record of this case indicates a level of prejudice that warrants appellate relief. As the trial court

noted, this was an emotional outburst by a family member of a witness. The outburst occurred on the second day of a lengthy trial, was brief, and did not disclose any factual information that the jury had not already heard.[8] Moreover, the trial court immediately settled the courtroom, then addressed the jury, giving a model curative instruction that sensitively explained why jurors could not treat the outburst as evidence. The court also allowed defense counsel to decide whether to continue immediately with the cross-examination, in order to avoid drawing attention to the incident, or to take a brief recess. Counsel chose to take a recess, after which the examination resumed without further incident.

In these circumstances, the outburst was not likely to have a substantial impact on the jury. Therefore, we cannot say that the trial court erred or abused its discretion in declining to grant a mistrial.

**JUDGMENTS OF CONVICTION AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

8. Appellant's reliance on cases in which an outburst or blurt resulted in the jury hearing inadmissible evidence is misplaced. Although the outburst contained a reference to appellant "put[ting] a gun in [the victim's] face," Ms. Bowser had already testified to that fact in her direct examination. *Cf., e.g., Rainville v. State,* 328 Md. 398, 410, 614 A.2d 949 (1992) (concluding that a mistrial was required after mother of alleged child sex abuse victim blurted out that the defendant " 'was in jail for what he had done to' " the victim's nine-year-old brother); *Guesfeird v. State,* 300 Md. 653, 666–67, 480 A.2d 800 (1984) (concluding that a mistrial was required after key prosecution witness blurted out that she took a lie detector test).